MDL 2131

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

NOV 10 2009

FILED CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

In re Mansfield Oil Company Litigation

MDL-__________

**MOTION OF JORDAN ENTITIES FOR TRANSFER OF ACTIONS TO THE WESTERN DISTRICT OF NORTH CAROLINA PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

WNC Stores, LLC ("WNC Stores" or "Andrews Solo"), WNC Solo, Inc. ("WNC Solo" or "Robbinsville Solo"), White's Solo, LLC ("White's Solo"), Andy P. Jordan ("Jordan"), and Deborah Dupuis ("Dupuis"), all of whom are parties in one or more of the various actions listed in the Schedule of Actions served on even date herewith, and summarized below (collectively referred to as "the Jordan Entities" herein), by and through their undersigned counsel, and pursuant to Rule 42(a) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1407, respectfully move the Judicial Panel on Multidistrict Litigation (sometimes, "the Panel") to consolidate the following cases identified in the Schedule of Actions filed contemporaneously herewith:

(1) *Mansfield Oil Company of Gainesville, Inc. v. Andy P. Jordan, Deborah Dupuis, WNC Stores, LLC and WNC Solo, Inc.*, Case No. 1:09-cv-205, which is currently pending as a diversity action in the United States District Court for the Western District of North Carolina. This case has already been consolidated in the Western District with case no. 2 below;

(2) *WNC Stores, LLC, WNC Solo, Inc. and White's Solo, LLC v. Mansfield Oil Company of Gainesville, Inc.*, Case No. 2:09-cv-33 which was originally filed in the General Court of Justice for the Sate of North Carolina, Graham County, and is currently pending in the United States District Court for the Western District of North Carolina. It was removed as a diversity action, and a federal question has been presented by amended complaint. This case has already been consolidated in the Western District with case no. 1, above.; and

PLEADING NO. 1

OFFICIAL FILE COPY

IMAGED NOV 10 2009

(3) *Mansfield Oil Company of Gainesville, Inc. v. WNC Solo, Inc., f/k/a Market Center, Inc. and Andy Patton Jordan*, case no. 2:09-cv-108-WCO, which was originally filed in the Superior Court of Hall County, State of Georgia. Following removal, it is currently pending in the United States District Court for the Northern District of Georgia.

The Jordan Entities respectfully move that the foregoing cases be consolidated into one action for pre-trial proceedings, in the United States District Court for the Western District of North Carolina, as well as for trial there, whether pursuant to the authority of the Panel or pursuant to resolution of certain motions to transfer venue currently pending in cases 2 and 3, above. In further support of this motion, the Jordan Entities respectfully show the Panel as follows:

1. These actions involve common questions of fact and common questions of law, as set forth below and as more fully presented in the Brief in Support of Motion of the Jordan Entities for Transfer of Actions to the Western District of North Carolina pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings ("Brief in Support of Motion to Transfer"), which is filed herewith.

2. The actions are between the same business entities and individuals as parties, and the consolidation of these cases into one action is the most efficient and expeditious course of litigation, enabling the parties to secure full relief in the most effective manner. To avoid multiplicity of suits, duplication of testimony, and unnecessary expense and delay, and for the convenience of the parties and the Court, these actions should be consolidated.

3. Should these actions not be consolidated, then multiple possibilities exist that dispositive or other rulings in one court could directly conflict with rulings of another court. Many

of the issues are the same, and additional issues overlap, requiring consolidation to prevent the possibility of inconsistent rulings.

4. The United States District Court for the Western District of North Carolina is the most convenient forum for these actions to be litigated, as all parties but Mansfield Oil Company of Gainesville, Inc. ("Mansfield") physically reside or are located in the Western District of North Carolina, and all parties do business in the Western District of North Carolina. Further, for venue purposes, Mansfield is also considered a resident of the Western District of North Carolina as it does business here. As shown in the pleadings, motions, affidavits, and other court filings, the businesses and personal property in dispute in these actions are located in the Western District of North Carolina. The controversies at the heart of these actions also arose there, and the Western District of North Carolina is the place where most of the witnesses reside whom the Jordan Entities expect to be called to testify.

5. Moreover, all the parties to the various pending cases are already involved in litigation in the United States District Court for the Western District of North Carolina. The litigation in the Northern District of Georgia does not include the following parties: (a)White's Solo; (b) WNC Stores; and (c) Deborah Dupuis.

6. Mansfield, as a plaintiff, made Jordan, Dupuis, WNC Stores, and WNC Solo parties to litigation in the Western District of North Carolina when it filed case no. 1 above. It also invoked federal jurisdiction over White's Solo when it removed case no. 2 to the Western District of North Carolina. By filing its own lawsuit in the Western District of North Carolina, then removing the case filed by the Jordan Entities to the same district,

Mansfield made all parties to these disputes subject to the proceedings within the Western District of North Carolina.

7. The litigation also involves proceedings under the Petroleum Marketing Practices Act ("PMPA"). These proceedings raise federal questions that have already been presented, briefed, and decided in part by the United States District Court for the Western District of North Carolina. The court's rulings on those matters involving federal legislation should not be subject to the possibility of inconsistency by any contrary rulings in the Northern District of Georgia, further showing the Western District of North Carolina to be an ideal forum in which to litigate these disputes.

8. Moreover, the procedural advancement and posture of cases 1 and 2 show that the United States District Court for the Western District of North Carolina is ideal for further proceedings. That court has entered orders denying Mansfield's motion for claim and delivery, and allowing the Jordan Entities' motions for preliminary injunction, in cases 1 and 2, respectively.

9. Mansfield has made an interlocutory appeal of both of the rulings described in the preceding paragraph to the United States Court of Appeals for the Fourth Circuit, to which court appeal does not lie from the Northern District of Georgia. This appeal further binds the interests of the parties to litigation in the North Carolina forum, as any appellate rulings would be remanded to the Western District for further proceedings.

Based on the foregoing, and for the reasons more fully developed in the Brief In Support of Motion to Transfer, the Jordan Entities respectfully pray that the Panel transfer these cases to the United States District Court for the Western District of North Carolina for consolidation; and

that it provide the Jordan Entities with such other and further relief as the Panel may deem just and proper.

This, the 5th day of November, 2009.

s/*Edward L. Bleynat, Jr.[North Carolina State Bar#16558]*

Edward L. Bleynat, Jr. [*North Carolina State Bar#16558]*
FERIKES & BLEYNAT, PLLC
21 Broad Street
Asheville, NC 28801
*Attorneys for WNC Stores, LLC, WNC Solo, Inc., White's Solo, LLC, Andy P. Jordan, and Deborah Dupuis*

*s/ William J. Piercy [Georgia State Bar #579627]*

*s/ Kristin N. Zielmanski [Georgia StateBar #300286]*

William J. Piercy [*Georgia State Bar#579627*]

Kristin N. Zielmanski [*Georgia State Bar#300286*]
Berman Fink Van Horn, P.C.
3423 Piedmont Road NE Suite 200
Atlanta GA 30305
*Attorneys for WNC Solo, Inc. and Andy P. Jordan.*

Signed w/express permission by William J. Piercy

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 10 2009

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

In re Mansfield Oil Company Litigation MDL-____________

**BRIEF IN SUPPORT OF THE MOTION OF JORDAN ENTITIES FOR TRANSFER OF ACTIONS TO THE WESTERN DISTRICT OF NORTH CAROLINA PURSUANT TO 28 U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL PROCEEDINGS**

WNC Stores, LLC ("WNC Stores" or "Andrews Solo"), WNC Solo, Inc. ("WNC Solo" or "Robbinsville Solo"), White's Solo, LLC ("White's Solo"), Andy P. Jordan ("Jordan"), and Deborah Dupuis ("Dupuis"), sometimes collectively called "the Jordan Entities" herein, by and through their undersigned counsel, and pursuant to Rule 42(a) of the Federal Rules of Civil Procedure and 28 U.S.C. 1407, hereby submit this Brief in Support of the Motion of the Jordan Entities for Transfer of Actions to the Western District of North Carolina Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings (sometimes, "motion" or "motion to consolidate").

**BACKGROUND:**

**STATEMENT OF THE CASE**

The facts underlying the lawsuits shown in the Schedule of Actions have resulted in the following parallel litigation in various courts:

1. *Mansfield Oil Company of Gainesville, Inc. v. Andy P. Jordan, Deborah Dupuis, WNC Stores, LLC and WNC Solo, Inc.*, United States District Court for the Western District of North Carolina, Case No.1:09-cv-209: Mansfield Oil Company of Gainesville, Inc. ("Mansfield" or "MOC") filed this lawsuit in the United States District Court for the Western District of North Carolina, Asheville Division, on 29 May 2009. On 1 October

2009, United States Magistrate Judge Dennis L. Howell ("Judge Howell") consolidated it with case number two, below.

2. *WNC Stores, LLC, WNC Solo, Inc., formerly known as Market Center, Inc., and White's Solo, LLC v. Mansfield Oil Company of Gainesville, Inc.*, United States District Court for the Western District of North Carolina, Case No:2:09-cv-33: The Jordan Entities filed this lawsuit on 29 May 2009 as Case No.: 09-CVS-90 in the General Court of Justice for the State of North Carolina, Superior Court Division, Graham County. They obtained on that day a temporary restraining order preventing Mansfield from interfering with the delivery of fuel or other supplies to the Jordan Entities' places of business. On 4 June 2009, Mansfield removed the case to the United States District Court for the Western District of North Carolina, Bryson City Division, after which it was assigned its current number. On 1 October 2009, Judge Howell consolidated it with case number one, above.

3. *Mansfield Oil Company of Gainesville, Inc. v. WNC Solo, Inc. f/k/a Market Center, Inc. and Andy Patton Jordan*, United States District Court for the Northern District of Georgia, Case No.: 2:09-cv-108-WCO: Mansfield filed this lawsuit on 29 May 2009 in the Superior Court of Hall County, State of Georgia, as Case No.: 09-cvs-2140J. It was removed to the United States District Court for the Northern District of Georgia, Gainesville Division, on 2 July 2009 and assigned its current number. This case shall sometimes be called "the Georgia Federal suit."

4. *Mansfield Oil Company of Gainesville, Inc. v. White's Solo, LLC and Andy Patton Jordan*, Superior Court of Hall County, State of Georgia, Case No. 2009-sv-1186D. Mansfield filed this lawsuit in the Superior Court of Hall County, State of Georgia, on 2

July 2009. This case has remained in Georgia State court and is not listed on the Schedule of Actions. The amount in controversy is insufficient for removal to Federal court. This case shall sometimes be called "the Georgia State suit."

A number of procedural developments have taken place in the respective actions that are relevant to this motion. Case no. 1 and case no. 2, which will sometimes be collectively referred to as "the WDNC litigation" herein, have resulted in rulings on two important motions: Mansfield's Motion for Claim and Delivery in case 1, and the Jordan Entities' Motion for Preliminary Injunction in case 2. Both motions were heard by the Honorable Lacy Thornburg prior to his retirement. Judge Thornburg entered a Joint Memorandum and Order on 15 August 2009 denying Mansfield's Motion for Claim and Delivery in case 1, and granting the Jordan Entities' Motion for Preliminary Injunction in case two.

Mansfield appealed both rulings to the United States Court of Appeals for the Fourth Circuit. The Fourth Circuit has since consolidated those cases for appeal and future filings as matter no. 09-1989(L). The Fourth Circuit denied Mansfield's motion to expedite the appeal.

The parties are now before the Judicial Panel on Multidistrict Litigation (sometimes, "the Panel" or "the Court") on the Jordan Entities' motion to consolidate.

## STATEMENT OF THE FACTS

### A. The Parties.

WNC Stores is a North Carolina limited liability company with an office and principal place of business in Cherokee County, North Carolina. It owns and operates a convenience store and gas station commonly called "Andrews Solo."

WNC Solo, formerly known as Market Center, Inc., is a North Carolina corporation with

an office and principal place of business in Graham County, North Carolina. It owns and operates a convenience store and gas station commonly called "Robbinsville Solo."

White's Solo is a North Carolina limited liability company formerly operating with an office and principal place of business in Cherokee County, North Carolina. It owned and operated a convenience store and gas station that was commonly called "White's Solo."

Collectively, these entities are owned or managed, in whole or in part, by Jordan and Dupuis, who are husband and wife. All the businesses are located within the Western District of North Carolina, where Jordan and Dupuis reside. Because Jordan was the first party involved in these businesses, he and the parties aligned with him are referred to as "the Jordan Entities" herein.

Mansfield is a Georgia corporation which does a tremendous amount of ongoing business in the State of North Carolina, including the Western District. Mansfield has provided the Jordan Entities with equipment improving real estate, including underground storage tanks, and other equipment. Mansfield also provided motor fuel for sale to the public at the Jordan Entities' places of business.

**B. <u>The Underlying Facts</u>.**

The circumstances leading to the parties' relationship began in 2003 when a Mr. Larry Reynolds ("Reynolds"), to whom Mansfield was supplying fuel for a convenience store Reynolds operated in Andrews, North Carolina, sold his interest in the Andrews store to Jordan. Reynolds assigned his rights and responsibilities under a fuel marketing agreement with Mansfield to Jordan, individually. In turn, Jordan assigned those rights to WNC Stores, which now operates the facility called Andrews Solo.

As to Andrews Solo, and the other gas station and convenience store locations involved in this litigation, the parties have executed pairs of documents entitled "Retail Marketing Agreement" or "RMA's", and "Special Purpose Leases" or "SPL's". Pursuant to the pertinent terms of the Special Purpose Leases, the Jordan Entities leased to Mansfield interests in the real properties where the stores are located. Mansfield improved the properties by installing its equipment for use in the retail distribution of motor fuel to consumers. Pursuant to the companion Retail Marketing Agreements, the parties agreed that Mansfield would maintain ownership of all motor fuel and petroleum products placed into Mansfield equipment until the fuel was sold to retail consumers. The parties agreed that the Jordan Entities would sell Mansfield's fuel, deposit the gross fuel sale proceeds into a bank account, and report the amount of fuel sold to Mansfield, which was able to draw out funds. The parties would share the fuel sales profits after deducting "costs" according to various formulas.

As set forth in detail in the Amended Complaint filed on behalf of the Jordan Entities in case no. 2 of the WDNC litigation, Mansfield, through its agents John Boyd, Michael Mansfield, and others, fraudulently induced the Jordan Entities to establish relationships with them in connection with supplying petroleum products to the convenience stores the Jordan Entities owned and operated. Without limitation, and over the life of the parties' relationships, Mansfield systematically misrepresented the way that fuel costs and other matters affecting the parties' compensation were calculated so as to secure economic advantages to itself and to the Jordan Entitles' injury. In addition, Mansfield entered into fuel supply agreements with WNC Solo's competitors in Robbinsville, North Carolina, including the local Texaco and Chevron stations. Mansfield also had numerous uncured operational defaults, such as failing properly to maintain

and improve equipment, and otherwise breaching its fiduciary and other duties to use its best efforts to secure success of the Jordan Entities. For instance, after agreeing to supply Robbinsville Solo's competitors in close proximity, Mansfield also set prices in such a fashion as to injure Robbinsville Solo's business. This injury was accomplished in such a way as to limit the opportunity for Robbinsville Solo to make sales of unbranded fuel at a lower price than its branded competitors, Texaco and Chevron - - lower prices being an unbranded station's stock in trade - - while Mansfield itself profited by *any* of these stations selling fuel to the motoring public. The lack of fuel purchases also resulted in decreased inside sales of the Robbinsville Solo facility, thereby damaging business.

As a result of Mansfield's conduct, the Jordan Entities have suffered devastating consequences, and declared Mansfield to be in default of its obligations. Mansfield failed and refused to cure the defaults. The Jordan Entities are seeking relief through case no. 2. Their amended pleadings have brought claims under federal legislation known as the Petroleum Marketing Practices Act (sometimes, "PMPA"). Judge Thornburg's order allowing the Jordan Entities' Motion for Preliminary Injunction was based, in part, upon the PMPA.

Mansfield likewise seeks redress for alleged breaches of duty by the Jordan Entities in the three lawsuits it has filed, now pending in the Western District of North Carolina (case no. 1), the Northern District of Georgia (case no. 3), and the Superior Court of Hall County, State of Georgia (case no. 4). The Jordan Entities seek relief from this fragmented and expensive litigation brought about by Mansfield's multiple filings. Mansfield could well have joined all parties and sought all relief in case no. 1, which it filed in the Western District of North Carolina; or by bringing counterclaims in case no. 2, the suit the Jordan Entities brought against Mansfield

on the same day, and which Mansfield removed to the Western District of North Carolina.

**ARGUMENT:**

**I. THE GEORGIA FEDERAL CASE SHOULD BE TRANSFERRED TO THE WESTERN DISTRICT OF NORTH CAROLINA AND CONSOLIDATED WITH THE NORTH CAROLINA CASES, PURSUANT TO 28 U.S.C. § 1407.**

The parties are now before the Panel on a motion to consolidate the multidistrict federal litigation into the Western District of North Carolina. Based upon the governing statutory standards, the common questions of fact and law, the presence of jurisdiction over all the litigants in all the cases, the convenience of the parties and witnesses, the just and efficient conduct of the actions (especially in light of the procedural posture of all the cases), and the economies, both for the parties and for the judiciary, consolidation in the Western District of North Carolina is needed.

As the Panel well knows, coordination of multidistrict litigation is governed by 28 U.S.C. § 1407. Section 1407(a) provides, in pertinent part:

> When civil actions involving one or more common questions of fact are pending in different districts, such actions may be transferred to any district for coordinated or consolidated pretrial proceedings. Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions. . . .

The foregoing statute authorizes transfer and consolidation of multidistrict actions and allows the Panel to override a plaintiff's choice of forum where the following three factors are present: (1) "one or more common questions of fact are pending in different districts[;]" (2) a transfer would serve "the convenience of the parties and witnesses[;]" and (3) a transfer would

"promote the just and efficient conduct of [the] actions." 28 U.S.C. § 1407(a); *see also In Re Vernitron Secs. Litig.*, 462 F.Supp. 391, 394 (J.P.M.L. 1978). Centralization of multidistrict litigation serves to avoid duplication of discovery, to prevent inconsistent pretrial rulings, and to conserve the resources of the parties, their counsel, and the judiciary. *In Re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig.*, 170 F.Supp.2d 1356 (J.P.M.L. 2001).

It is well established that "[t]ransfer under Section 1407 does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer." *In Re Classicstar Mare Lease Litigation*, 528 F. Supp.2d 1345,1346 (J.P.M.L. 2007). The *Classicstar* Court held that centralization is both permissible and beneficial where, regardless of differences among the actions, all arose from the same factual milleu, and raised common factual questions regarding the promotion and operation of the business in dispute. *Id.: see also In Re Checking Account Overdraft Litigation*, 626 F.Supp.2d 1333 (J.P.M.L. 2009).

Of special assistance in this matter is precedent involving suit by franchisees against a franchisor oil company under the PMPA. Where related PMPA actions were pending in different judicial districts and different states, the cases have properly focused on what factors make a forum most appropriate. In the case of *In Re Shell Oil Products Co. Dealer Franchise Litigation* 206 F.Supp.2d 1373 (J.P.M.L. 2002), three related actions were pending in different judicial districts in three different states. The states were New Hampshire, Rhode Island and Massachusetts. There, the plaintiff-franchisees moved, pursuant to 28 U.S.C. § 1407, to centralize these actions in the District of Massachusetts for coordinated or consolidated pretrial proceedings. The franchisor defendants opposed the plaintiffs' motion to transfer, but suggested that the Southern District of Texas would be proper if consolidation were allowed. The Judicial

Panel on Multidistrict Litigation held that centralization was warranted, and that the District of Massachusetts was the appropriate transferee forum. Id. at 1374. Its order stated as follows:

> [T]hese actions involve common questions of fact arising out of allegations that the Shell Oil defendants' elimination of the Variable Rent Program (and the termination of a substitute program in January 2000) violated the terms of plaintiffs' franchise agreements as well as the federal Petroleum Marketing Practices Act. The Panel also finds that centralization in the District of Massachusetts will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation, while accordingly being necessary in order to avoid duplication of discovery, prevent inconsistent pretrial rulings and conserve the resources of the parties, their counsel and the judiciary.

*Id.* Noting that one action was already pending there before a District Court Judge who was already familiar with the litigation, having presided over a related predecessor action, the Panel decided that the District of Massachusetts was the appropriate transferee forum. *Id.*

Under the foregoing cases, all pending federal actions should be consolidated in the Western District of North Carolina. It is the district where Mansfield originally filed claims against WNC Stores, WNC Solo, Jordan, and Dupuis in case no. 1. It also the court to which the claims that the Jordan Entities brought against Mansfield were removed in case no. 2. With their filing of an amended complaint, jurisdiction now exists in that district not only under a diversity basis for removal, but also under federal question jurisdiction.

By contrast, the claims pending in the Northern District of Georgia involve only Mansfield, WNC Solo, and Jordan. No jurisdiction has been established there over any of the other parties to these actions, including White's Solo, WNC Stores, and Dupuis. Moreover, in the Georgia State suit, Mansfield has brought claims against White's Solo and, for the third time, Jordan. There is no federal jurisdiction over White's Solo in Georgia.

Tellingly, Mansfield could have presented counterclaims against White's Solo in the Western District of North Carolina following its removal of case no. 2 to federal court. Or, it could have made White's Solo a defendant in case no. 1. While the reasons for the selective omission of White's Solo from its North Carolina claims is known only to Mansfield, the effects of that omission have included driving up litigation costs by adding unnecessary lawsuits in Georgia State Court and in Georgia Federal Court when all parties and issues could have easily been joined in the Western District of North Carolina. As it stands, the *only* forum in which all parties have brought claims or raised defenses, or both, is the Western District of North Carolina. Especially since Mansfield was the first party to avail itself of that court's jurisdiction, the case for consolidation in the Western District is compelling.

**A. One or more common questions of fact are pending in the WDNC Litigation and Georgia Federal Suit.**

Each individual factor of the multidistrict analysis favors transfer of the Georgia action and consolidation with the WDNC litigation. The underlying facts in the WDNC litigation - - both case no. 1 brought by Mansfield, and case no. 2 brought by the Jordan Entities, respectively - - concern the terms, enforceability, conditions, and performance of any obligations relating to the RMA's and SPL's executed among the parties, the Jordan Entities' letters declaring that Mansfield was in default, its failure to cure, and the termination of the RMA's and SPL's. The WDNC litigation also involves federal and state statutory claims and state common law claims. All claims brought by any party relate to the Jordan Entities' ownership and operation of convenience stores and gas stations located in North Carolina. In short, and as the pleadings show, the underlying facts revolve around the parties' business relationship in which Mansfield

supplied fuel and other petroleum products to the Jordan Entities, and leased pumps, tanks, machinery, apparatus and equipment for the Jordan Entities' use in distribution to the public.

Similarly, in the Georgia federal case, Mansfield alleges that the Jordan Entities sold Mansfield's petroleum products without depositing sales proceeds into Mansfield's account; that the Jordan Entities allowed other fuel suppliers to deliver petroleum products to Mansfield's fuel storage equipment on the premises; and that the Jordan Entities used Mansfield's petroleum product dispensing equipment, including its fuel pumps and fuel storage tanks to sell petroleum products supplied by third parties. These allegations, upon which Mansfield relies in bringing its claims for breach of contract, breach of guaranty, and injunctive relief seeking to stop the Jordan Entities from using equipment over which Mansfield has title, are central to the events occurring in the geographic area of the Western District of North Carolina[1].

**B. Consolidation in the Western District of North Carolina will result in convenience of parties and witnesses.**

One of the primary factors examined in any motion to transfer is the convenience of the forum to the parties and witnesses. Separately litigating these cases in two states would no doubt prove inconvenient for these groups. All matters in dispute between the parties in the WDNC litigation, as well as in the Georgia Federal suit, pertain to the operation of convenience stores and gas stations owned by the Jordan Entities and the use of equipment located thereon, all of which is in Western North Carolina, the situs of the WDNC litigation.

---

[1] While the documentation among the parties provides for equipment to continue to be titled to Mansfield, the effect of the Preliminary Injunction in favor of the Jordan Entities, and the denial of Mansfield's Motion for Claim and Delivery, is that the Jordan Entities are in lawful and proper possession of the equipment titled to Mansfield during the course of this litigation. Mansfield's remedy at law, if any, is adequate.

Witnesses will testify about the equipment located in Western North Carolina. The evidence expected includes the condition of the equipment, and efforts by Mansfield to enter onto the Jordan Entities' property and to terminate the Jordan Entities' operations by removing underground storage tanks and related equipment. The witnesses would likely include fuel delivery truck drivers, store clerks, and the management of trucking companies who provided fuel to the location and received threats from Mansfield about severe consequences if they supplied the Jordan Entities. Additional witnesses would include bookkeepers, accountants, and others who can testify about the financial results of Mansfield's dealings with the Jordan Entities. Customers and suppliers can testify about the degraded condition of the equipment provided by Mansfield in violation of the Jordan Entities' rights. Especially with respect to White's Solo, the location that went out of business based upon the shoddy performance of Mansfield, the testimony of witnesses will be needed about the failure of Mansfield to provide equipment and amenities that would have made the store a success, consistent with its obligations under the Best Efforts clauses of the RMA's.

Georgia is inconvenient for these non-party witnesses and convenient only to Mansfield's internal personnel. However, the convenience to those corporate officials is relative, at best. There is no jurisdiction in the Northern District of Georgia over some of the parties to the WDNC litigation - - WNC Stores, Dupuis, and White's Solo. Therefore, Mansfield would still be required to provide witnesses in North Carolina. And, it cannot argue for more than minimal inconvenience in the Western District of North Carolina given that it considered the district to be a sufficiently convenient forum to file its claims against WNC Stores, WNC Solo, Jordan, and Dupuis there. Hence, not only the witnesses, but the parties themselves, have their convenience

best served on balance by consolidation in that district.

### C. Transferring the Georgia Federal case and consolidating it with the North Carolina Federal Cases will promote the just and effective conduct of the action.

Not only questions of fact and the convenience of parties and witnesses, but also the just and efficient conduct of the actions, make consolidation in the Western District of North Carolina ideal. The cost of litigating this dispute in both Georgia and North Carolina could potentially be enormous. Ever since *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1941), the seminal case regarding a court's discretion to decline or exercise jurisdiction on considerations of convenience, efficiency and justice, this consideration has been crucial.

Consideration of whether to consolidate the cases in North Carolina includes not only the location of the parties and witnesses, but the fact that if this case is not transferred, the litigants, parties and tribunals will almost certainly spend significantly more time, energy and money resolving the dispute. Moreover, the fact that three suits with similar subject matter are pending in federal district courts occurred in two different states allows for the possibility of inconsistent decisions among the Georgia and North Carolina federal courts, a result that would not foster the interests of justice. For the suits to proceed in an uncoordinated or even haphazard fashion through the channels of litigation could present problems concerning *res judicata* and collateral estoppel on dispositive motions entertained before trial, depending upon when each case was to reach that stage. Such a result could be avoided by the transfer of the Georgia Federal suit to the Western District of North Carolina, and its consolidation with the now pending WDNC litigation.

Of particular importance to the decisions before the Panel is the fact that the Western

District of North Carolina has made major rulings affecting the rights of the parties. Based upon the Preliminary Injunction papers, the United States District Court for the Western District of North Carolina entered orders based upon the PMPA and North Carolina's Claim and Delivery statute that protected the Jordan Entities. The possibility of deviation from that set of important pre-trial rulings in the Northern District of Georgia would be disruptive to the parties' positions in litigation. This risk is all the more enhanced based upon Mansfield having appealed Judge Thornburg's rulings in the WDNC litigation to the Fourth Circuit. Because the Fourth Circuit encompasses the Western District of North Carolina, but not the Northern District of Georgia, there is the possibility of inconsistent rulings which are not easily rectified, even on remand or further appeal. The District Court rulings in the WDNC litigation and the Fourth Circuit appeal further bind the interests of the parties to litigation in the North Carolina forum, as any appellate rulings would be remanded to the Western District for further proceedings.

**D. The Western District of North Carolina has jurisdiction and is a proper venue for the Georgia Federal Case and the North Carolina Federal case.**

For all of the reasons stated above, transferring the Georgia Federal suit to Western North Carolina to be consolidated with the WDNC litigation will best promote the just and efficient conduct of the litigation, while preventing duplication of discovery, inconsistent pretrial rulings, and conserving the resources of the parties, their counsel and the judiciary. This principle finds support also in the related law governing venue.

The statutory provisions for change of venue under 28 U.S.C. § 1404 and multidistrict litigation under § 1407 are not mutually exclusive, and, when appropriate, should be used in concert to effect the most expeditious disposition of multidistrict litigation. *In Re*

*Koratron*, 302 F. Supp. 239 (J.P.M.L. 1969). They may properly be used in concert and to complement one another. *General Tire & Rubber Col. v. Jefferson Chemical Co.*, 50 F.R.D. 112, (S.D.N.Y. 1970). For this reason, the Panel should also consider the Jordan Entities' motion to consolidate North Carolina and Georgia cases in light of § 1404, which provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404.

It is undisputed that venue under statutory standards set forth in 28 U.S.C.S. §1391 would allow the Western District of North Carolina to have been the proper venue for the Georgia federal action. The Georgia federal action is based upon diversity of citizenship, and could have been brought in the Western District of North Carolina, where the defendants reside, and which is the district in which a substantial part of the events or omissions giving rise to the claim occurred. It is also a district where all parties were subject to personal jurisdiction at the time the action was commenced. Consequently, there is no doubt that venue over the Georgia federal action would have been proper in the Western District of North Carolina.

Because such venue would be proper in the Western District of North Carolina, the Jordan Entities offer for the Panel's additional consideration case law developed in that district. One of the important cases is *Uniprop* v. Home Owners Funding Corp, 753 F. Supp. 1315 (W.D.N.C. 1190). Regarding the transfer of a case, the Western District of North Carolina has stated as follows:

> It is well established that the moving party carries the burden of establishing that a case should be transferred. *See generally* 1A Moore's Federal Practice, ¶ 0.345 [5] at 4360 (Matthew Bender 1990) (hereinafter, "Moore's"). This Court has

> consistently found that the burden is a heavy one. . . . The decision to transfer is left to the sound discretion of the trial court. *Moore's* at 4362; *see also In re: Ralston Purina Co.*, 762 F.2d 1002, 1005 (4th Cir. 1984); *Bates,* 624 F. Supp. at 227 (*citing Akers v. Norfolk & Western Railway Co.*, 378 F.2d 78, 80 (4th Cir. 1967)).

*Uniprop*, 753 F. Supp. at 1322 (footnote omitted).

The *Uniprop* court recites the factors to be considered by a court when deciding upon a party's motion to transfer. These include:

1. The plaintiff's initial choice of forum;
2. The residence of the parties;
3. The relative ease of access of proof;
4. The availability of compulsory process for attendance of witnesses and
5. Costs of obtaining attendance of willing witnesses;
6. The possibility of a view;
7. The enforceability of a judgment, if obtained;
8. The relative advantages and obstacles to a fair trial;
9. Other practical problems that make a trial easy, expeditious, and inexpensive;
10. The administrative difficulties of court congestion;
11. The interest in having localized controversies settled at home and the appropriateness in having the trial of a diversity case in a forum that is at home with the state law that must govern the action; and
12. The avoidance of unnecessary problems with conflict of laws.

The analysis of these factors is qualitative, not merely quantitative. *Id.* at 1322. The foregoing factors, examined qualitatively, compel the conclusion that transfer and consolidation in the Western District of North Carolina is appropriate.

**1. The plaintiff's initial choice of forum:** The Jordan Entities' choice of forum was the General Court of Justice for the State of North Carolina. However, they have not opposed removal of case no. 2 to the Western District of North Carolina and, indeed, have amended to bring federal claims which would have independently supported the basis for federal jurisdiction. In case no.1, Mansfield's choice of forum was the Western District of North Carolina. Mansfield

elected to fragment its litigation and to bring lawsuits in the Superior Court of Hall County, State of Georgia, the first of which was case no. 3 - - properly removed to theNorthern District of Georgia. Thus, all parties have chosen the Western District of North Carolina as a forum where they are willing to litigate. The propriety of this decision is not undermined by the presence of Georgia forum selection clauses in some of the RMA's and SPL's. *See Rice v. Bellsouth*, 240 F. Supp. 2d 526, 530 (W.D.W.C. 2002) (holding that a transfer out of the Western District of North Carolina to the Northern District of Georgia was not warranted despite forum selection clause). This factor strongly favors the Georgia Federal suit being transferred to the Western District of North Carolina for consolidation.

**2. The residence of the parties:** The second factor, residence of the parties, examined qualitatively, also favors the Jordan Entities. The Jordan Entities are small businesses located in Western North Carolina. Jordan and Dupuis are residents of the Western District of North Carolina. Mansfield, a large corporation, is considered a resident of the Western District of North Carolina for venue purposes as it does business there. Transfer is favored.

**3. The relative ease of access to proof:** The relative ease of access to proof favors the Western District of North Carolina. The stores, equipment and fuel involved in this case served western North Carolina customers. The Jordan Entities' evidence is located in North Carolina. While Mansfield may have to ship any documents in its possession to counsel in Asheville during discovery, it would be required to do that anyway, regardless of where suit is pending, because it filed case no 1 here. This factor favors transferring the Georgia Federal suit to the Western District of North Carolina.

**4. and 5. The availability of compulsory process for attendance of witnesses and the**

**costs of obtaining attendance of willing witnesses:** When considering the availability of compulsory process for attendance of witnesses and the costs of obtaining attendance for willing witnesses, this factor favors the Western District of North Carolina as well. For instance, the Jordan Entities' customers and employees who could testify are located there. Not only is Georgia inconvenient for the witnesses; retention of the Georgia Federal suit would require pre-trial proceedings to take place in more than one suit involving the same nucleus of issues and facts in two separate states. This problem is complicated in that Georgia Federal court does not have personal or subject matter jurisdiction over all the litigants. Only in the Western District of North Carolina can all parties continue to be involved in one consolidated case over which personal and subject matter jurisdiction already exist.

**6. The possibility of a view:** The equipment and stores are all located in the Western District of North Carolina, favoring the Jordan Entities if such a view is needed.

**7. The enforceability of a judgment if obtained:** This factor does not affect this case.

**8. The relative advantages and obstacles to a fair trial:** The Jordan Entities are confident that a fair trial can be had by all parties in the Western District of North Carolina. The Jordan Entities reside there. Mansfield has chosen to file suit against Jordan, Dupuis, WNC Stores, and WNC Solo, in that district. Therefore, Mansfield must also be confident in the fairness of a forum where it filed suit and continues to do a tremendous amount of business. Conversely, the Jordan Entities would come into Gainesville, Georgia as outsiders, where Mansfield is a major employer and has its corporate headquarters.

**9. Other practical problems that make a trial easy, expeditious, and inexpensive:** All parties involved in the Georgia Federal suit and the WDNC litigation are already

before the Court in the Western District of North Carolina. Separately litigating these cases in two venues would no doubt prove inconvenient for the parties and witnesses.

**10. The administrative difficulties of court congestion:** The Western District of North Carolina, Asheville Division, where the WDNC litigation is already consolidated, has a track record of moving cases along quickly, which is consistent with counsel for Jordan Entities' experience. *See also Rice, supra*. The Jordan Entities are unfamiliar with the statistics concerning the Northern District of Georgia.

**11. The interest in having localized controversies settled at home and the appropriateness in having the trial of a diversity case in a forum that is at home with a state law that must govern the action:** This factor favors the Jordan Entities. The controversy arose in North Carolina and affects most heavily people in North Carolina. Accordingly, it is a localized controversy. The putative forum selection clauses do not alter the local character. They were part and parcel of the Jordan Entities' execution of the documents based on the fraudulent inducements. Thus, there is a strong interest in having it resolved in North Carolina.

**12. The avoidance of unnecessary problems with conflict of laws:** The question of what state's law governs what aspects of this case is also in the Jordan Entities' favor. The Jordan Entities' claims against Mansfield arise out of a relationship governed in large part by the tort laws of the State of North Carolina, contractual choice of law clauses notwithstanding. For instance, Mansfield has provided product and improvements that are subject to North Carolina DENR regulation. Mansfield's claims evoke real estate laws and remedies which must be local. Mansfield's tortious conduct in or affecting North Carolina commerce violated North Carolina statutory and common law. The injuries to the Jordan Entities were sustained in the Western

District. A preponderance of the claims are to be governed by Federal law and North Carolina law. Accordingly, a court sitting in North Carolina is the better of forum.

**Summary:** In examining at all the factors, both qualitatively and quantitatively, the Panel may observe that factors 1-6, and 8-11, strongly or slightly favor the Jordan Entities' motion. Factor 7 is neutral. No factors favor Mansfield.

## CONCLUSION

The interests of justice and principles of judicial economy compel the conclusion that the Georgia Federal case be transferred to the Western District of North Carolina and consolidated with the WDNC litigation.

This, the 5th day of November, 2009.

*s/ Edward L. Bleynat, Jr.[North Carolina State Bar#16558]*

Edward L. Bleynat, Jr. [*North Carolina State Bar#16558]*
FERIKES & BLEYNAT, PLLC
21 Broad Street
Asheville, NC 28801
*Attorneys for WNC Stores, LLC, WNC Solo, Inc., White's Solo, LLC, Andy P. Jordan, and Deborah Dupuis*

*s/ William J. Piercy [Georgia State Bar #579627]*
*s/ Kristin N. Zielmanski [Georgia StateBar #300286*]

William J. Piercy [*Georgia State Bar#579627*]

Kristin N. Zielmanski [*Georgia State Bar#300286*]
Berman Fink Van Horn, P.C.
3423 Piedmont Road NE Suite 200
Atlanta GA 30305
*Attorneys for WNC Solo, Inc. and Andy P. Jordan*

Signed w/express permission by William J. Piercy

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION
NOV 10 2009
FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

MDL-____________ In re Mansfield Oil Company Litigation

**SCHEDULE OF ACTIONS**

| Case Captions | Court | Civil Action No. | Judge |
|---|---|---|---|
| **Plaintiff:** Mansfield Oil Company of Gainesville, Inc.<br><br>**Defendants:** Andy P. Jordan, Deborah Dupuis, WNC Stores, LLC and WNC Solo, Inc.<br><br>**Movants:** Andy P. Jordan, Deborah Dupuis, WNC Stores, LLC and WNC Solo, Inc. | Western District of North Carolina | 1:09-cv-205 | Hon. Martin K. Reidinger, District Court Judge; Hon. Dennis L.Howell, Magistrate Judge |
| **Plaintiffs:** WNC Stores, LLC, WNC Solo, Inc. and White's Solo, LLC<br><br>**Defendant:** Mansfield Oil Company of Gainesville, Inc.<br><br>**Movants:** WNC Stores, LLC, WNC Solo, Inc. and White's Solo, LLC | Western District of North Carolina | 2:09-cv-33 | Hon. Martin K. Reidinger, District Court Judge; Hon. Dennis L. Howell, Magistrate Judge |

RECEIVED
CLERK'S OFFICE
2009 NOV -6 A 9:56
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

| | | | |
|---|---|---|---|
| **Plaintiff:**<br>Mansfield Oil Company of Gainesville, Inc.<br><br>**Defendants:**<br>WNC Solo, Inc., f/k/a Market Center, Inc. and Andy Patton Jordan<br><br>**Movants:**<br>WNC Solo, Inc., f/k/a Market Center, Inc. and Andy Patton Jordan | Northern District of Georgia | 2:09-cv-108-WCO | Hon. William C. O'Kelley, District Judge |

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 10 2009

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

In re Mansfield Oil Company Litigation MDL-__________

**PROOF OF SERVICE**

I hereby certify that copies of the foregoing Motion, Brief, Schedule of Actions and this Certificate of Service were served via FedEx and/or electronic mail on November 5, 2009, to the following:

Clerk, Western District of North Carolina
Asheville, NC

Clerk, Northern District of Georgia
Gainesville, GA

Scott@lawyersasheville.com
W. Scott Jones
21 Battery Park Ave. Suite 201
Asheville, NC 28801
**Counsel for Plaintiff:** Mansfield Oil Company of Gainesville, Inc.
WDNC File No. 1:09-cv-205
**Counsel for Defendant:** Mansfield Oil Company of Gainesville, Inc.
WDNC File No.2:09-cv-33

*malexander@smf-law.com*
Mark Alexander
Stewart, Melvin & Frost, LLP
The Hunt Tower
200 Main St., Suite 200
Gainesville, GA 30501
**Counsel for Plaintiff:** Mansfield Oil Company of Gainesville, Inc.
ND Ga File No. 2:09-cv-108-WCO

RECEIVED
CLERK'S OFFICE
2009 NOV -6 A 9:57
JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

s/ *Edward L. Bleynat, Jr.[North Carolina State Bar#16558]*

Edward L. Bleynat, Jr. [*North Carolina State Bar#16558]*
FERIKES & BLEYNAT, PLLC
21 Broad Street
Asheville, NC 28801
*Attorneys for WNC Stores, LLC, WNC Solo, Inc., White's Solo, LLC, Andy P. Jordan, and Deborah Dupuis*

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 10 2009

FILED
CLERK'S OFFICE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL ACTION NO. 2:09-cv-33

WNC STORES, LLC, WNC SOLO, INC., )
formerly known as Market Center, Inc., )
and WHITE'S SOLO, LLC, )
)
PLAINTIFFS, )
)
v. )
)
MANSFIELD OIL COMPANY OF )
GAINESVILLE, INC., )
)
DEFENDANT. )

## AMENDED COMPLAINT

Plaintiffs, by and through their undersigned counsel, and pursuant to Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure, hereby amend their complaint as a matter of right. Complaining of defendant, plaintiffs allege and say as follows:

## THE PARTIES

1. Plaintiff WNC Stores, LLC (sometimes, "WNC Stores"), is a North Carolina limited liability company with an office and principal place of business in Cherokee County, North Carolina.

2. Plaintiff WNC Solo, Inc., formerly known as Market Center, Inc. (sometimes, "WNC Solo"), is a North Carolina corporation with an office and principal place of business in Graham County, North Carolina.

3. Plaintiff White's Solo, LLC (sometimes,"White's Solo") is a North Carolina limited liability company formerly operating an office and principal place of

business in Cherokee County, North Carolina.

4. Upon information and belief, defendant Mansfield Oil Company of Gainesville, Inc. (sometimes, "defendant", "Mansfield", or "MOC") is a Georgia corporation with an office and principal place of business outside the State of North Carolina but which does business in the State of North Carolina.

5. The amount in controversy, without interest and costs, exceeds the sum or value specified by 28 U.S.C. §1332.

6. This action, as amended, arises under a federal statute, 15 U.S.C. §2801 *et seq.*, the Petroleum Marketing Practices Act (sometimes, "the PMPA"or "the Act").

7. This action is subject to the removal jurisdiction of the Court under Rule 81(c) of the Federal Rules of Civil Procedure.

THE UNDERLYING FACTS

8. The allegations set forth in the previous paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

9. On or about 1 August 2004, WNC Stores executed documentation captioned as an Assignment of Retail Marketing Agreement between it, as assignee, and Andy P. Jordan (sometimes, "Jordan") and Deborah Dupuis (sometimes, "Dupuis"), as assignors. Jordan and Dupuis are also member managers of WNC Stores. Pursuant to that documentation, WNC Stores assumed such rights and obligations as Jordan and Dupuis possessed and which had previously been assigned to them by Larry

Reynolds (sometimes, "Mr. Reynolds") in connection with owning and operating a convenience store and gas station located in Andrews, Cherokee County, North Carolina, commonly called Andrews Solo (sometimes, "the Andrews Solo store").

10. Mr. Reynolds had previously been the marketer under a Retail Marketing Agreement with defendant Mansfield dated 5 July 1997 (sometimes, "the Andrews Solo RMA"). Pursuant to the Andrews Solo RMA, Mr. Reynolds and Mansfield agreed to certain terms and conditions around the supply of petroleum products for sale to the public at the Andrews Solo store. Jordan and Dupuis, and then WNC Stores, succeeded to any rights and responsibilities represented in this document, Jordan and Dupuis having done so by assignment of the Andrews Solo RMA dated 3 November 2003 and WNC Stores having succeeded to Jordan's and Dupuis' rights and responsibilities on 1 August 2004.

11. On or about 24 August 2005, WNC Solo, then known as Market Center, Inc., executed certain documentation in connection Mansfield supplying WNC Solo with petroleum products to sell to customers at a convenience store and gas station owned by WNC Solo and located in Robbinsville, Graham County, North Carolina (sometimes, "Robbinsville Solo").

12. In or around August 2004, plaintiff White's Solo executed certain documentation with Mansfield in connection with providing petroleum products at a location in Andrews, Cherokee County, North Carolina known as White's Solo (sometimes, "White's Solo"). White's Solo later

went out of business.

13. In connection with entering and acting under the various supply agreements described above, called Retail Marketing Agreements or RMAs herein, Mansfield, through its agents John Boyd, Michael Mansfield, and others, made fraudulent inducements to cause plaintiffs to establish relationships with them in connection with supplying petroleum products to the convenience stores plaintiffs owned and operated.

14. In executing the foregoing documentation, plaintiffs reposed the utmost trust and confidence in Mansfield as a fiduciary. Mansfield has often referred to the parties' relationship as being partners.

15. Without limitation, Mansfield made representations about the manner in which it would handle fuel pricing in order for plaintiffs to sell unbranded fuel at a competitive advantage through offering lower prices to the public while still making a reasonable profit margin on the fuel. Unbeknownst to plaintiffs, but as part of Mansfield's pattern and practice of doing business, Mansfield had the intent, and acted on that intent, to misrepresent the way that fuel costs and other matters affecting the relationship between the parties were calculated in such a manner as to secure financial and other economic advantages to itself fraudulently and without regard to plaintiffs' rights.

16. Under the RMAs which were executed by and among the various parties, it was Mansfield's duty to set prices for product being sold. In connection with setting such prices, and without limitation, Mansfield engaged in the

following actions:

(a) It set prices for a period of time before ceasing to do so because it was understaffed, in disregard of plaintiffs' rights to work with a competent supplier;

(b) During the time Mansfield was not setting the price, plaintiffs attempted to do so competitively based, in part, upon such factors as cost quotations that Mansfield gave to plaintiffs and upon local retail fuel prices among competitors;

(c) Upon information and belief, and for a period of time extending over months (if not years), Mansfield's quotes were consistently lower than the actual cost of the fuel that it charged to plaintiffs. As a result, prices as set were based upon bad quotes, not true rates premised on accurate cost calculations, Mansfield having repeatedly failed and refused to disclose those to plaintiffs;

(d) In late January 2009, Mansfield resumed regular pricing. While its cost quotes during that time period may have been accurate for a while, they were not consistently accurate, causing plaintiffs WNC Stores and WNC Solo to sustain loses based on margins;

(e) Mansfield supplied fuel containing ethanol blending to plaintiffs when doing so was disadvantageous based upon price fluctuations and tax credits;

(f) Mansfield understated the freight cost to the point that plaintiffs from time to time were caused to underprice fuel and lost the ability

to recoup the cost;

(g) Mansfield refused to install debit card readers at White's Solo, despite it being a highly sought feature by customers; and

(h) Mansfield otherwise engaged in fuel pricing practices that were advantageous to itself and disadvantageous to plaintiffs in violation of fiduciary relationships.

17. In addition, and upon information and belief, Mansfield has entered into supply agreements with plaintiff WNC Solo's principal competitors in Robbinsville, being the Texaco and Chevron stations. As a consequence of this action and breach of fiduciary duty, Mansfield has positioned itself to benefit from the sales of fuel supplied to consumers in the Robbinsville market regardless of which retailer is successful in attracting customers. Doing so is in violation of the "Best Efforts" clauses to protect mutual interests found in paragraph 8 of the RMAs, which Mansfield fraudulently induced plaintiffs to execute.

18. Mansfield would even from time to time allow the plaintiffs' pricing to become disadvantageous by comparison to Time Out, a local vendor and competitor, to the point that Robbinsville Solo lost even more sales.

19. Upon information and belief, Mansfield takes advantage of vendor discounts on payment terms in such a manner as to retain all the benefit of the discounts for itself, rather than passing part of those on to plaintiffs, so reducing plaintiffs' costs, as reflected in the difference between the costs stated to plaintiffs upon which they based their pricing during the

time period when plaintiffs were responsible for that, and the actual cost paid after Mansfield took advantage of its discount. Mansfield thus charges plaintiff something other than the actual cost to it, in violation of plaintiff's rights.

20. Upon information and belief, Mansfield calculates volume shrinkage of inventory in a manner advantageous to itself and disadvantageous to plaintiffs in violation of generally accepted accounting principles and other standards.

21. Upon information and belief, Mansfield has engaged in misconduct with respect to the credit card costs to plaintiffs and has refused to account to plaintiffs for this.

22. Mansfield has engaged in service-related defaults, including failure to replace warning lights, to maintain and upgrade signs, to provide quality debit and credit card services that would enhance sales opportunities, and has failed to maintain the appearance of the facilities, and otherwise failed to act in the best interest of plaintiffs to whom it owed fiduciary duties.

23. Mansfield's conduct was fraudulent from the inception of the relationship between the parties and fraudulently induced plaintiffs to enter into the RMAs.

24. In the alternative, Mansfield acted fraudulently after the establishment of the parties' relationship in a tortious manner.

25. Based upon Mansfield's misconduct, plaintiffs put it on notice of default and demanded a cure.

26. Because Mansfield did not cure its defaults to plaintiffs, the RMAs, to the extent they were viable at all in light of Mansfield's fraudulent conduct, were declared null and void and/or cancelled based upon the specific events of default described herein and Mansfield's failure to cure

27. After receiving the notices of default, Mansfield not only failed to cure, it also purported to place its tanks in temporary closure status with North Carolina DENR, and contacted plaintiffs' fuel suppliers and trucking companies to threaten them with reporting DENR violations, with litigation, and/or with termination of business relationships with Mansfield itself, in the event that they did supply plaintiffs with product. Further, Mansfield has attempted to enter plaintiffs' property and remove items that are lawfully in plaintiffs' temporary possession. Mansfield has undertaken these actions to damage plaintiffs in their business.

28. Mansfield is obligated under the RMAs to pay plaintiffs commissions for sales upon reaching certain thresholds.

29. Mansfield made such payment in May, 2009, then debited the payments to plaintiffs from plaintiffs' accounts without authorization in amounts exceeding $10,000.00.

30. As a direct and proximate result of Mansfield's acts and omissions, as more particularly described herein, plaintiffs have been damaged and will be damages in an amount in excess of $75,000.00.

31. Unless Mansfield is preliminarily and permanently enjoined from engaging in this conduct, plaintiffs will sustain irreparable harm.

FIRST CLAIM FOR RELIEF
*(Fraud in the Inducement)*

32. The allegations set forth in the previous paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

33. Mansfield's misrepresentations described herein were intentional and related to material facts.

34. Mansfield intended that plaintiffs would rely upon said material misrepresentations and omissions to their detriment in executing the RMAs.

35. Plaintiffs did, in fact, reasonably rely on Mansfield's material misrepresentations and omissions to their detriment in executing the RMAs.

36. As a direct and proximate result of the acts and omissions of Mansfield as described herein, plaintiffs are entitled to rescind the RMAs and are entitled to recover incidental and consequential damages, including recissionary damages, as alleged herein.

37. As a direct and proximate result of Mansfield's material misrepresentations, non-disclosures, concealments, and other fraudulent conduct, plaintiffs, in the alternative to rescission, are entitled to recover compensatory damages from Mansfield in an amount in excess of $75,000.00.

38. Plaintiffs are entitled to recover actual damages from Mansfield in an amount in excess of $75,000.00.

## SECOND CLAIM FOR RELIEF
*(Fraud)*

39. The allegations set forth in the previous paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

40. Upon information and belief, throughout the time of plaintiffs' relationship with Mansfield, Mansfield knew it was improperly calculating fuel costs, volume shrinkage, credit card costs, and other items described herein.

41. Nonetheless, Mansfield continued to assess these costs to plaintiffs in such as manner as to secure benefits to itself in excess of what the RMAs allowed.

42. When asked to account for its practices, Mansfield refused to do so, continuing to deceive plaintiffs.

43. Mansfield's fraudulent misrepresentations, non-disclosures, and concealments about these practices are material.

44. Plaintiffs reasonably relied to their detriment upon Mansfield's fraudulent misrepresentations, non-disclosures, and concealments of information which plaintiffs could not discover in the exercise of reasonable care and diligence.

45. Plaintiffs are entitled to recover actual damages from Mansfield in an amount in excess of $75,000.00.

## THIRD CLAIM FOR RELIEF
*(Negligent Misrepresentation)*

46. The allegations set forth in the previous paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

47. Mansfield had actual or constructive knowledge of the circumstances involving cost allocation, pricing, and other practices described herein, yet continued to engage in those practices.

48. Mansfield was required to make full and accurate disclosures to plaintiffs of all facts known or discoverable with reasonable diligence that were likely to affect plaintiffs' decisions about how to price product and deal with plaintiffs as partners in their undertakings.

49. Plaintiffs were entitled to rely upon and were justified in relying upon Mansfield's representations about pricing product and other items.

50. Plaintiffs, as purchasers of Mansfiled's products and services, are in the group of persons for whose guidance Mansfield provided information concerning fuel supply and pricing.

51. Mansfield, during the course of its dealing with plaintiffs and in furtherance of its pecuniary interest, supplied false information for the guidance of plaintiffs and/or failed to disclose or concealed such information.

52. Mansfield failed to exercise reasonable care or competence in obtaining and/or communicating said information.

53. Plaintiffs reasonably and justifiably relied to their detriment upon the information provided by Mansfield.

54. Mansfield negligently breached duties to plaintiffs as described herein, without limitation, by misrepresentations, non-disclosures, and concealments as to the practices described herein. Further, it violated the best efforts clauses under the RMAs to work toward plaintiffs and

Mansfield having a successful business relationship.

55. By its actions, representations, and omissions described herein, Mansfield did influence plaintiffs' conduct in operating under the RMAs.

56. Mansfield failed to exercise reasonable care or competence in obtaining and/or communicating said information to plaintiffs.

57. Plaintiffs reasonably and justifiably relied to their detriment upon the information provided by Mansfield.

58. Plaintiffs conducted a reasonable investigation into the business, pricing, cost allocations, and other practices of Mansfield. Even so, the true facts were not discoverable by plaintiffs in the exercise of reasonable diligence.

59. As a direct and proximate result of Mansfield's negligent misrepresentations, plaintiffs have been damaged and will be damaged in an amount in excess of $75,000.00.

FOURTH CLAIM FOR RELIEF
*(Unfair and Deceptive Commercial Practices)*

60. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

61. The communications, transactions, and occurrences described herein were in or affecting commerce.

62. Mansfield's conduct as alleged herein was unfair, unscrupulous, oppressive, unethical, immoral, and substantially injurious.

63. Mansfield's conduct, as described herein, was in furtherance of its business as a competitor in sale of motor fuels in Western North Carolina.

64. Mansfield's conduct, as alleged herein, is an unfair method of competition.

65. As a direct and proximate result of Mansfield's unfair or deceptive acts or practices in or affecting commerce, plaintiffs have suffered and will suffer damages in an amount in excess of $75,000.00.

66. Plaintiffs are entitled to have their damages trebled pursuant to N.C.G.S.§76-16.

67. Plaintiffs are entitled to recover their attorneys' fees pursuant to N.C.G.S.§75-16.1.

FIFTH CLAIM FOR RELIEF
*(Breach of Contract)*

68. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

69. To the extent that the RMAs or other documentation that the parties have executed be deemed enforceable contracts by the Court, then and to that extent they form contracts.

70. Mansfield has breached contractual obligations to plaintiffs as described herein, including, but not limited to, in its dealings with plaintiffs in violation of the best efforts clauses of the RMAs.

71. The acts and omissions of the Mansfield as described herein proximately caused plaintiffs to sustain damages in an amount in excess of $75,000.00.

72. Plaintiffs are entitled to recover actual damages from Mansfield in an amount in excess of $75,000.00.

SIXTH CLAIM FOR RELIEF
(*Quantum Meruit*)

73. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

74. Plaintiffs have paid Mansfield millions of dollars.

75. Mansfield voluntarily accepted the cash so paid.

76. Mansfield has received this money by virtue of its wrongful acts and omissions as described herein.

77. If cash paid to Mansfield in excess of value received is not returned to plaintiffs, Mansfield would be unjustly enriched in the amount of payments received by it that exceed its entitlement under the RMAs.

78. Plaintiffs are entitled to restitution from Mansfield in quantum meruit to the extent of its unjust enrichment, including for the plaintiffs' money had and received by Mansfiled.

79. The amount plaintiffs are entitled so to recover is in excess of $75,000.00.

SEVENTH CLAIM FOR RELIEF
(*Conversion*)

80. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

81. In debiting plaintiff's accounts and taking their funds, Mansfield has asserted unauthorized control over plaintiffs' personal property to plaintiffs' exclusion, willfully and maliciously.

82. As a direct and proximate result of Mansfield's actions, plaintiffs have been damaged and will be damaged in an amount in excess of

$75,000.00.

EIGHTH CLAIM FOR RELIEF
*(Breach of Fiduciary Duty)*

83. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

84. In failing to act in a manner consistent with its duties to plaintiffs, Mansfield has breached its fiduciary duties to plaintiff.

85. As a direct and proximate result of Mansfield's breaches of fiduciary duty, plaintiffs have been damaged and will be damaged in an amount in excess of $75,000.00.

NINTH CLAIM FOR RELIEF
*(Temporary Restraining Order and Preliminary and Permanent Injunctions)*

86. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

87. Mansfield's conduct as described herein will cause plaintiffs to suffer irreparable harm, if not restrained and enjoined during litigation.

88. Mansfield must be directed to withdrawal its notice of temporary closure, to inform plaintiffs' actual or prospective fuel suppliers and trucking companies of same, to credit plaintiffs' accounts with funds wrongfully debited, and to stay off plaintiffs' property unless authorized by plaintiffs to enter thereon.

89. Plaintiffs, on numerous occasions throughout the years, have requested copies of engineering plats and/or plans and/or drawings for the Andrews

Solo and Robbinsville Solo store locations indicating precisely where the fuel tanks are located, what kind of tanks they are, how big the repair field is, and other considerations they would need to know in the event of an environmental hazzard occurrence. Their requests have gone unanswered. Mansfield must be directed to provide such pertinent information to plaintiffs.

90. Plaintiffs' remedy at law is inadequate, as Mansfield's conduct would cause plaintiffs to suffer irreparable harm. Therefore, plaintiffs are entitled to an extension of the pre-removal temporary restraining order already issued by the Honorable James U. Downs, Senior Resident Superior Court Judge, Graham County, and to preliminary and permanent injunctions protecting their rights.

## TENTH CLAIM FOR RELIEF
*(Punitive Damages)*

91. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

92. Mansfield's acts and omissions as described herein are willful and wanton conduct in reckless disregard of and indifference to the rights and well being of plaintiffs

93. The acts, omissions, and conduct described herein involve participation or condonation by officers, directors, and managers of Mansfield.

94. Plaintiffs are entitled to recover punitive damages in an amount in excess of $75,000.00 pursuant to N.C.G.S.§ 1D-1, *et. seq.* of the North Carolina

General Statutes.

ELEVENTH CLAIM FOR RELIEF
*(Declaratory Judgment)*

95. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

96. Plaintiffs were defrauded into entering into the transactions described herein.

97. Upon information and belief, Mansfield has taken the position that its conduct toward plaintiffs was not fraudulent.

98. Plaintiffs have executed documents, including the RMAs, in reliance upon Mansfield's fraudulent inducements.

99. The parties have an actual justiciable controversy as to their respective rights and duties under the RMA's and related documents.

100. Plaintiffs are entitled to a judgment pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §2201 *et. seq*. declaring the respective rights and obligations of plaintiffs and Mansfield and declaring that the RMAs are invalid because of the fraudulent inducement.

TWELFTH CLAIM FOR RELIEF
*(An Accounting)*

101. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

102. An accounting of the payments, receipts, assets, liabilities, income and expenses relating to the RMAs, and of such other financial transactions involving the parties hereto and their partnership as may have taken

place, is needed for proper allocation of funds to plaintiffs.

103. The appointment of an independent accountant to examine the books, records, and accounts of the parties with respect to same, is needed to order to determine the rights and legal relationships of the parties.

THIRTEENTH CLAIM FOR RELIEF
*(Tortious Interference with Contract and Prospective Economic Advantage)*

104. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

105. In contacting shipping companies, trucking companies, fuel supply companies, and DENR, Mansfield has toritously interfered with plaintiffs' contracts and prospective economic advantage.

106. Mansfield has done so maliciously and with intent to interfere with plaintiffs' business.

107. As a direct and proximate result of Mansfield's tortious interference plaintiffs have been damaged and will be damaged in an amount in excess of $75,000,00.

FOURTEENTH CLAIM FOR RELIEF
*(Damages for Violation of the Petroleum Marketing Practices Act)*

108. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference.

109. Mansfield is a distributor of motor fuel which, under the RMA's, authorized or permitted plaintiffs as other distributors or retailers to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark (to wit, the "SOLO" trademark), which, upon information and belief, was

owned or controlled by Mansfield or others permitting such use.

110. The RMA's by and between Mansfield and plaintiffs are franchise contracts pursuant to the Petroleum Marketing Practices Act in that they are: (a) contracts under which plaintiffs operate and market Mansfield's goods which are subject to leases and other agreements in connection with the sale, consignment, or distribution of motor fuels under the Solo trademark as described herein; and/or (b) contracts pertaining to the supply of motor fuel which is to be sold, consigned, or distributed under the SOLO trademark which Mansfield authorizes or permits plaintiffs to use.

111. Franchise relationships exist between defendants, on the one hand, and plaintiffs, on the other, in that their agreements involve motor fuel marketing, distribution, and other obligations and responsibilities with respect to the sale, consignment, or distribution of motor fuel. Defendant, therefore, acts as a franchisor, and plaintiffs as frachisees, under the Act.

112. Mansfield, in its relationship with plaintiffs, purchases motor fuel for sale, consignment, or distribution to another and plaintiffs make motor fuel available to the general public for ultimate consumption.

113. Plaintiffs maintain marketing premises using the SOLO trademark or service mark.

114. Mansfield provides motor fuel to plaintiffs in interstate commerce.

115. The relationship between the parties is such that Mansfield has stood in a fiduciary capacity to plaintiffs as further described herein.

116. As operators of convenience store-related facilities, plaintiffs possessed entrepreneurial responsibility for selling product provided by Mansfield to the general public.

117. By Mansfield engaging in conduct described herein, including setting prices wrongly, engaging in oppressive and inaccurate financial and accounting practices, and failing to cure its bad business practices despite literally years of demands by plaintiffs, Mansfield has forced a constructive termination of the parties' relationship under the Act, and has subjected plaintiffs to discriminatory treatment by not honoring the pricing provisions that are essential to selling unbranded fuel, instead allowing other customers, who were plaintiffs' competitors, price advantages detrimental to plaintiffs.

118. Plaintiffs are entitled to actual and exemplary damages and attorney and expert witness fees from defendant under the Petroleum Marketing Practices Act.

119. As a direct and proximate result of defendant's acts and omissions described herein, plaintiffs have been damaged and will be damaged in an amount in excess of $75,000.00.

FIFTEENTH CLAIM FOR RELIEF
*(Injunctive Relief for Violation of the Petroleum Marketing Practices Act)*

120. The allegations set forth in the above paragraphs of this Amended Complaint are realleged and incorporated herein by reference

121. In addition to damages, costs, and fees, plaintiffs are entitled to injunctive

relief under the Petroleum Marketing Practices Act.

122. Plaintiffs will be exposed to irreparable injury if defendant is allowed to continue to communicate inaccurate information to DENR and others about the tank closure process, and to threaten plaintiffs' fuel suppliers and trucking companies with "reporting them" to DENR, with litigation, and/or with termination of any business relationships with Mansfield, during the pendency of the litigation.

123. Unless defendant is enjoined from interfering with plaintiffs' business relationships, and interfering with property in plaintiffs' possession, including tanks and equipment, for which plaintiffs can pay fair retail value during the pendency of litigation while other issues are being addressed, plaintiffs will be irreparably damaged.

124. The franchise relationship between defendant and plaintiffs has been constructively terminated and there exist serious questions going to the merits of the controversy causing there to be a fair ground for litigation between the parties. There are no hardships imposed upon defendant by it being enjoined from interfering with plaintiffs' contractual relationships , from making false reports to DENR, and from not being allowed to enter plaintiffs' property to remove equipment.

125. Plaintiffs' remedy at law is inadequate, as Mansfield's conduct would cause plaintiffs to suffer irreparable harm if it were allowed to persist in the conduct described herein. Therefore, plaintiffs are entitled to preliminary and permanent injunctions under the Act.

WHEREFORE, plaintiffs respectfully pray as follows:

1. That Mansfield be preliminarily and permanently enjoined from interfering with plaintiffs' business operations;

2. That the RMAs be deemed rescinded and the parties placed as near to the *status quo ante* as possible;

3. That plaintiffs have and recover recissionary damages from Mansfield;

4. In the alternative, and/or the cumulative, that plaintiffs have and recover compensatory damages from Mansfield in an amount in excess of $75,000.00;

5. That plaintiffs' compensatory damages be trebled;

6. That plaintiffs be given a trial by jury on all issues of fact;

7. That the costs of this action, including reasonable attorneys' fees under N.C.G.S. §75-16.1, 28 U.S.C. §2801 *et. seq.* and other applicable law, be taxed against Mansfield; and

8. That plaintiffs have and recover such other and further relief as the Court may deem just and proper.

This the 17th day of June, 2009.

s/Edward L. Bleynat, Jr. [SB#16558]
FERIKES & BLEYNAT, PLLC
21 Broad Street
Asheville, NC 28801
Tele: (828) 251-1588
Fax: (828) 251-2214
*Attorneys for plaintiffs*

**CERTIFICATE OF SERVICE**

______This is to certify that the undersigned has this date served the foregoing **AMENDED COMPLAINT** on defendant in this action via e-mail - PDF format - addressed as follows:

SCOTT JONES
Cloninger, Barbour, Searson & Jones, PLLC
21 Battery Park Avenue
Suite 201
Asheville, North Carolina 28801

This, the 17th day of June, 2009.

s/Edward L. Bleynat, Jr. [SB#16558]

FERIKES & BLEYNAT, PLLC
21 Broad Street
Asheville, NC 28801
Tele: (828) 251-1588
Fax: (828) 251-2214

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL ACTION NO. 1:09-cv-205

MANSFIELD OIL COMPANY
of GAINESVILLE, INC.,
PLAINTIFF,

v.

ANDY P. JORDAN, DEBORAH DUPUIS, WNC
STORES, LLC, and WNC SOLO, INC.,
DEFENDANTS.
_______________________________/

AMENDED COMPLAINT
(Jury Trial Demanded)

NOW COMES the Plaintiff, Mansfield Oil Company of Gainesville, Inc, pursuant to Rule 15 of the Federal Rules of Civil Procedure, and hereby amends its Complaint as of right prior to the filing of a responsive pleading herein. Complaining of the Defendants, Plaintiff says and alleges as follows:

**PARTIES, VENUE AND JURISIDICTION**

1. Plaintiff, Mansfield Oil Company of Gainesville, Inc., (hereinafter "Mansfield") is a corporation organized and existing pursuant to the laws of the state of Georgia, doing business, among other places, in Cherokee County, North Carolina.

2. Defendant, Andy P. Jordan, (hereinafter "Jordan"), is a citizen and resident of Buncombe County, North Carolina.

3. Defendant, Deborah Dupuis, (hereinafter "Dupuis"), is a citizen and resident of Buncombe County, North Carolina.

4. Defendant WNC Stores, LLC (hereinafter "WNC Stores") is a limited liability company organized and existing pursuant to the laws of the state of North Carolina.

5. Defendant WNC Solo, Inc., (hereinafter "WNC Solo"), is a corporation organized and existing pursuant to the laws of the state of North Carolina.

6. Jordan and Dupuis, are the two member-managers of WNC Stores, LLC.

7. WNC Solo, Inc. is wholly owned and operated by Jordan and Dupuis.

8. Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332. Venue is appropriate pursuant to 28 U.S.C. § 1391.

## FACTS COMMON TO ALL COUNTS

9. Larry Reynolds (hereinafter "Reynolds") is a resident of the state of North Carolina.

10. WNC Stores and Jordan and Dupuis operate a convenience store and facility for the retail sale of motor fuel on real property located in Cherokee County, North Carolina (sometimes hereinafter "Property") which Property is more particularly described in that deed recorded in Book 1279 at Page 902 in the Office of the Register of Deeds of Cherokee County, North Carolina.

11. The Property is owned by WNC Solo, having been conveyed to WNC Solo by Reynolds in 2007.

12. In July 1997 Mansfield entered into a Special Purpose Lease (hereinafter "SPL") and a Retail Marketing Agreement (hereinafter "RMA" ) with Reynolds, who then owned the convenience store and facility for the retail sale of motor fuel located on the Property. The SPL is attached to the original Complaint as Exhibit A and herein incorporated by reference. The RMA is attached to the original Complaint as Exhibit B and herein incorporated by reference.

13. On 29 October 2003, Reynolds and his wife Deborah Reynolds entered into a Lease Agreement (with Option to Purchase) by which they leased the Property to Andy P. Jordan and Deborah Dupuis.

14. On 3 November 2003, Reynolds entered into an Assignment of Retail Marketing Agreement, attached to the original Complaint as Exhibit C and herein incorporated by reference, wherein he assigned his rights in the RMA to Andy P. Jordan and Deborah Dupuis.

15. On 1 August 2004, Andy P. Jordan and Deborah Dupuis entered into an Assignment of Retail Marketing Agreement, attached to the original Complaint as Exhibit D and herein incorporated by reference, wherein Jordan and Dupuis assigned their rights in the RMA to WNC Stores.

16. Between November 2003 and October 2007, Jordan and Dupuis and then WNC Stores assumed Reynolds' interest in the SPL.

17. On 2 October 2007, a Memorandum of Lease, attached to the original Complaint as Exhibit E and herein incorporated by reference, was entered into by and between Mansfield and WNC Solo, wherein WNC Solo consented to the terms of the SPL and acknowledged WNC Stores' assumption of Reynolds' interest therein.

18. The RMA provides that title to all motor fuel, diesel fuel, or other petroleum products provided and supplied by Mansfield to WNC Stores shall remain the property of Mansfield until sold by WNC Stores to the retail customer, and that at no time shall title to the motor fuel or other petroleum products pass to WNC Stores.

19. The RMA provides that WNC Stores shall utilize Mansfield as the exclusive supplier of motor fuel to the convenience store located on the Property.

20. The SPL provides that all pumps, tanks, machinery, apparatus and equipment furnished and installed by Mansfield in or on the leased premises at any time during the term of the SPL shall be and remain the sole property of Mansfield, and shall be considered at all times the personal property of Mansfield.

21. The SPL provides that Mansfield shall at all times during the SPL have the right of access, ingress, and egress to the property.

22. On or about 22 May 2009, without cause, WNC Stores purported to terminate the RMA.

23. The SPL provides that if the RMA is terminated, then the SPL shall also terminate.

24. Jordan, Dupuis, WNC Stores, and WNC Solo have retained Mansfield's property, that is, Mansfield's motor fuel and the equipment installed pursuant to the SPL and RMA, and have prevented Mansfield from exercising Mansfield's rights of ownership thereof.

25. WNC Stores has not paid Mansfield money owed to Mansfield pursuant to the RMA.

26. Jordan, Dupuis, WNC Stores, and WNC Solo have prohibited Mansfield access to its personal property, including motor fuel, tanks, pumps, meters, and related equipment.

27. Jordan, Dupuis, and WNC Stores, upon information and belief, have used and intend to use Mansfield's equipment located on the Property to dispense fuel not supplied or provided by Mansfield, in contravention of Mansfield's rights and the RMA.

## FIRST CLAIM FOR RELIEF
## CONVERSION as to JORDAN, DUPUIS, WNC STORES, LLC, AND WNC SOLO, INC

28. Pursuant to Rule 10(c) of the Rules of Civil Procedure, Mansfield hereby incorporates paragraphs 1-27 as if fully re-alleged herein.

29. Mansfield owns the motor fuel that it has supplied to WNC Stores at the Property pursuant to the terms of the RMA.

30. Mansfield owns the equipment that it has installed at the Property pursuant to the terms of the SPL.

31. Jordan, Dupuis, WNC Stores, and WNC Solo have assumed and exercised, without authorization, the rights of ownership of Mansfield's personal property described in paragraphs 29 and 30 above.

32. Jordan, Dupuis, WNC Stores, and WNC Solo have prevented Mansfield from exercising Mansfield's rights of ownership over the personal property described in paragraphs 29 and 30 above.

32A. Jordan, Dupuis, WNC Stores, and WNC Solo have improperly held Mansfield's personal property as described herein, have denied access to said personal property by Mansfield, and have failed to return the personal property to Mansfield despite demands that they do so.

32B. Mansfield hereby incorporates, pursuant to Rule 10(c) of the Rules of Civil Procedure, the allegations and demand for relief sought set forth in Mansfield's Motion for Claim and Delivery filed contemporaneously with this Amended Complaint.

33. Mansfield has sustained damages in excess of $75,000.00 as a direct and proximate result of the conversion of their personal property described in paragraphs 29 and 30 above.

34. By reason of the willful and wanton conduct of Jordan, Dupuis, WNC Stores, and WNC Solo, as described above, Mansfield is entitled to recover punitive damages in excess of $75,000.00.

**SECOND CLAIM FOR RELIEF**
**BREACH OF CONTRACT (RMA)**
**ANDY P. JORDAN, DEBORAH DUPUIS and WNC STORES, LLC**

35. Pursuant to Rule 10(c) of the Rules of Civil Procedure, Mansfield hereby incorporates paragraphs 1-34 as if fully re-alleged herein.

36. Mansfield has performed or tendered performance of all its obligations under the RMA.

37. Pursuant to the terms of the RMA and of the assignments attached hereto as Exhibits C and D, Jordan and Dupuis remain liable for the faithful performance of the obligations of the RMA.

contract, including but not limited to the lost benefit of the bargain; lost sales and revenues; and loss of the market value of the product assets.

45. By reason of the willful and wanton conduct of Jordan, Dupuis, and WNC Stores as described in this second cause of action, Mansfield is entitled to recover punitive damages of Jordan, Dupuis, and WNC Stores in an amount in excess of $75,000.00.

**FOURTH CLAIM FOR RELIEF**
**UNFAIR AND DECEPTIVE TRADE PRACTICES**
**JORDAN, DUPUIS, WNC STORES, LLC and WNC SOLO, INC.**

46. Pursuant to Rule 10(c) of the Rules of Civil Procedure, Mansfield hereby incorporates paragraphs 1-45 as if fully re-alleged herein.

47. The conduct of Jordan, Dupuis, WNC Stores, and WNC Solo as described herein were acts in and affecting commerce within, among other places, the state of North Carolina.

48. The acts and omissions as described herein are unfair and deceptive trade acts and practices prohibited by Chapter 75 of the North Carolina General Statutes.

49. As a direct and proximate result of the unfair and deceptive trade acts and practices of Jordan, Dupuis, WNC Stores, and WNC Solo, Mansfield is entitled to recover damages in an amount in excess of $75,000.00, trebled pursuant to the provisions of N.C.G.S. § 75-16.

WHEREFORE, the Plaintiff respectfully prays the Court as follows:

1. That the have and recover compensatory damages of the Defendants in an amount in excess of $75,000.00;

1A. That the Court order Defendants to immediately return Plaintiff's personal property to Plaintiff as more fully set forth in Plaintiff's Motion for Claim and Delivery filed herein;

2. That Plaintiff's damages proximately caused by Defendants' unfair and deceptive trade acts and practices be trebled pursuant to N.C.G.S. § 75-16;

4. That the Plaintiff have and recover from Defendants a sum in excess of $75,000.00 as punitive damages;

5. That the Plaintiff have and recover from Defendants its reasonable attorneys' fees, pursuant to N.C.G.S.§ 75-16.1;

6. That the costs of this action be taxed against the Defendants;

7. For a trial by jury; and

8. For such other and further relief as the Court deems just and proper.

This the 7th day of July, 2009.

CLONINGER BARBOUR SEARSON &
JONES, PLLC

/s/ W. Scott Jones
W. Scott Jones
N.C. Bar No. 18262
scott@lawyersasheville.com
W. Bradford Searson
N.C. Bar No. 18749
brad@lawyersasheville.com
21 Battery Park Ave., Suite 201
Asheville, NC 28801
Telephone (828) 252-5555
Fax (828) 232-9158
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that he has served the foregoing Motion for Claim and Delivery upon the in the above entitled action upon all parties to this cause by delivering a copy hereof to the parties or their attorneys of record.

ECF users were served electronically as follows:

Edward L. Bleynat, Jr.
Attorneys for Plaintiff
EDBLEYNAT@AOL.COM

This the 7th day of July, 2009.

s/ W. Scott Jones
W. Scott Jones

FILED IN CLERK'S OFFICE
U.S.D.C. - Gainesville

JUL 2 2009

JAMES N. HATTEN, Clerk
By: Vicki Dougherty
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

| | | |
|---|---|---|
| MANSFIELD OIL COMPANY OF GAINESVILLE, INC.<br><br>Plaintiff,<br><br>vs.<br><br>WNC SOLO, INC. f/k/a MARKET CENTER, INC. and ANDY PATTON JORDAN, individually<br><br>Defendants. | * | CASE NO. 2 09-CV-0108 -WCO |

NOTICE OF REMOVAL

As authorized by 28 U.S.C. § 1441, Defendants, WNC Solo, Inc. f/k/a Market Center, Inc. and Andy Jordan, individually, hereby give Notice of Removal to this honorable Court from the Superior Court referenced herein, and in support hereof shows as follows:

1.

On May 29, 2009, Plaintiff commenced an action against Defendant in the Superior Court of Hall, Georgia, Civil Action File No. 09-CV-2140J, the case is currently pending in said Court.

2.

A Temporary Order was issued by the Superior Court of Hall County, the Honorable Bonnie Oliver on June 4, 2009.

3.

On July 2, 2009, council for Defendants acknowledged service of the Summons and Complaint on behalf of said Defendants.

4.

Plaintiff is a Georgia corporation with its principal place of business in Georgia. Defendant WNC Solo, Inc. f/k/a Market Center, Inc. is a North Carolina corporation with its principal place of business in North Carolina.

5.

Defendant Andy Jordan is a natural person who is domiciled and resides in the State of North Carolina.

6.

The amount and controversy is in excess of Seventy Five Thousand Dollars ($75,000.00).

7.

This Court has original jurisdiction of the above-referenced action pursuant to 12 U.S.C. § 1332(a), and the action may therefore be removed from this Court pursuant to 28 U.S.C. § 1441(b).

8.

Copies of Plaintiff's Complaint (**Exhibit A**), Defendants' Acknowledgement of Service (**Exhibit B**), and the Temporary Order (**Exhibit C**) referenced herein are attached hereto.

9.

Wherefore, Defendants request that this action be removed from the Superior Court of Hall County, Georgia, to this Honorable Court.

Respectfully submitted, this 2ND day of July, 2009.

J. Cale Rogers, for:
COLEMAN & CHAMBERS, LLP
Georgia Bar No. 612648
Attorneys for Defendants

**COLEMAN & CHAMBERS, LLP**
1370 Thompson Bridge Road, Suite 300
Gainesville, Georgia 30501
Telephone: (770) 534-3770
Facsimile: (770) 534-1148

IN THE SUPERIOR COURT OF HALL COUNTY

STATE OF GEORGIA

| | |
|---|---|
| MANSFIELD OIL COMPANY OF GAINESVILLE, INC.<br><br>Plaintiff,<br><br>vs.<br><br>WNC SOLO, INC. f/k/a MARKET CENTER, INC. and ANDY PATTON JORDAN, individually<br><br>Defendants. | CIVIL ACTION FILE NO: 09-CV-2140J |

FILED HALL CO., GA
2009 MAY 29 AM 8:08
CHARLES BAKER, CLERK SUPERIOR-STATE COURT
BY

**COMPLAINT**

**COMES NOW** Mansfield Oil Company of Gainesville, Inc., the Plaintiff in the above-styled action and files this it's Complaint against Defendants and respectfully shows the Court as follows:

1.

Plaintiff, Mansfield Oil Company of Gainesville, Inc. is a corporation duly organized and existing under the laws of the state of Georgia.

2.

The Defendants are subject to the jurisdiction of this Court, and venue is proper in Hall County, Georgia under the terms of an agreement between the Plaintiff and Defendant WNC Solo, Inc. f/k/a Market Center, Inc. (hereinafter referred to as "Defendant Solo"), which agreement is set forth below. Defendant Solo may be served through its registered agent, Andy Jordan, at 1578 Hendersonville Rd., Asheville, NC,

28803. Defendant Andy Jordan (hereinafter referred to as "Defendant Jordan") may be served at 106 Jasmine Ln., Asheville, NC 28803.

## COUNT I – BREACH OF CONTRACT

3.

On or about August 24, 2005, Plaintiff and Defendant Solo entered into that certain Mansfield Retail Marketing Agreement (hereinafter referred to as "Agreement") regarding premises located at U.S. Highway 129 in Robbinsville, Graham County, North Carolina and being more particularly described in the Agreement (hereinafter referred to as the "Premises"). A true and correct copy of the Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

4.

Pursuant to Section 42 of the Agreement, disputes shall be governed by the laws of the State of Georgia and pursuant to Section 43 of the Agreement Defendant submits to the jurisdiction of the Courts of Hall County, Georgia and agrees that venue is proper in Hall County, Georgia.

5.

Under the terms of the Agreement, Defendant Solo agreed to use its best efforts to promote and sell Plaintiff's petroleum products through petroleum dispensing equipment owned and installed on the Premises by Plaintiff.

6.

On or about August 24, 2005, Plaintiff and Defendant Solo entered into a Special Purpose Lease granting Plaintiff a leasehold interest in the portion of the Premises necessary to install, maintain and operate Plaintiff's petroleum products, pumps, tanks,

machinery, apparatus, pumping, metering and related equipment and the right to access such equipment (hereinafter referred to as the "Lease"). A true and correct copy of the Lease is attached hereto as Exhibit "B" and incorporated herein by reference.

7.

The initial terms of the Agreement and Lease expire on February 24, 2025 and Plaintiff has an option to renew the Agreement and Lease for an additional an five year term after the expiration of the initial terms.

8.

Under the terms of the Agreement, Plaintiff is designated as the exclusive supplier of petroleum products to the Premises and Defendant Solo is required to sell Plaintiff's petroleum products during all hours of operation.

9.

Under the terms of the Agreement, Defendant Solo is required to collect the proceeds from the sale of Plaintiff's petroleum products as an agent for Plaintiff and owes Plaintiff a fiduciary duty in the handling of the proceeds.

10.

Under the terms of the Agreement, Defendant Solo is required to deposit 100% of the gross proceeds of the previous day's sale of petroleum products at the Premises in cash in a bank account in Plaintiff's name.

11.

Under the terms of the Agreement, Plaintiff has the exclusive right to sell petroleum products on the Premises and use Plaintiff's equipment located thereon for the purpose of selling such products.

12.

Under the terms of the Agreement, Plaintiff and Defendant Solo agreed to divide the Net Proceeds per gallon for all petroleum products

13

On or about May 6, 2009, Defendant Solo sent Plaintiff a letter threatening to terminate the Agreement and Lease based upon alleged "events of default" set forth therein. A true and correct copy of said letter is attached hereto as Exhibit "C" and incorporated herein by reference.

14.

Plaintiff responded to the alleged "events of default" through letter dated May 15, 2009 whereby Plaintiff disputed the factual basis of the alleged events and agreed to address any legitimate issues raised in a timely manner. A true and correct copy of said letter is attached hereto as Exhibit "D" and incorporated herein by reference.

15.

On or about May 21, 2009, Defendant Solo sent Plaintiff a letter wrongfully terminating the Agreement and Lease and barring Plaintiff from entering the Premises. A true and correct copy of said letter is attached hereto as Exhibit "E" and incorporated herein by reference.

16.

After the wrongful termination, Defendant Solo sold Plaintiff's petroleum products and failed to deposit the proceeds therefrom into Plaintiff's account.

17.

Further, Defendants allowed other fuel suppliers to deliver petroleum products

into Plaintiff's fuel storage equipment located on the Premises.

18.

In addition, Defendant Solo used Plaintiff's petroleum product dispensing equipment including, Plaintiff's fuel pumps and fuel storage tanks to sell petroleum products supplied by third parties.

19.

Defendant Solo has breached the Agreement and Lease by wrongfully terminating same prior to the expiration of the initial term, barring Plaintiff from entering the premises to access its equipment, failing to use its best efforts to sell Plaintiff's petroleum products, failing to deposit proceeds from the sale of Plaintiff's petroleum products and by using Plaintiff's equipment without Plaintiff's permission to store and dispense fuel provided by third parties.

20.

Upon termination of the Agreement, in addition to any other remedies provided therein or allowed by law, Plaintiff is entitled to either remove its equipment or require Defendant Solo to purchase the equipment for Plaintiff's cost of $292,227.13.

21.

As a result of Defendant Solo's wrongful termination of the Agreement and Lease, Plaintiff is entitled to a judgment for the cost of Plaintiff's equipment located on the Premises in the amount of $292,227.13 plus additional damages in an amount to be proved at trial plus interest at the legal rate.

## COUNT II – BREACH OF GUARANTY

22.

Paragraphs 1-21 are incorporated herein by this reference as if fully set forth herein.

23.

Defendant Andy Patton Jordan executed that certain Guaranty in favor of Plaintiff (hereinafter referred to as the "Guaranty"), a true and correct copy of which is attached hereto as Exhibit "F" and incorporated herein by reference.

24.

Under the terms of the Guaranty Defendant unconditionally guarantees payment of any and all obligations and indebtedness owed by Defendant Solo to Plaintiff including, without limitation, Defendant Solo's obligations under any fuel marketing agreement.

25.

The Agreement was entered into by Plaintiff as a result of and on the strength of the Guaranty.

26.

Defendant Jordan has breached the Guaranty by failing failed to perform its obligations under the Guaranty.

27.

As a result of Defendant Jordan's breach of the Guaranty, Plaintiff is entitled to a judgment against Defendant Jordan for the cost of Plaintiff's equipment located on the

Premises in the amount of $292,227.13 plus additional damages in an amount to be proved at trial plus interest at the legal rate.

## COUNT III -INJUNCTIVE RELIEF

28.

Plaintiff repleads and incorporates herein by reference paragraphs 1-27 of its Complaint as though fully set forth herein.

29.

As indicated in the facts detailed above, the Defendants are using the fuel dispensing and fuel storage equipment owned by Plaintiff for Defendants financial gain and have refused to provide Plaintiff access to its equipment.

30.

Since Plaintiff may not access its own equipment to monitor Defendants use of same and the product stored and dispensed therefrom, Plaintiff has no control over the maintenance and condition of the equipment; however Plaintiff remains potentially liable to a third party for any harm resulting from its use.

31.

Furthermore, subsequent to Defendant Solo's wrongful termination of the Agreement, Plaintiff exercised its right to temporarily close its fuel storage tank located on the Premises and did so in accordance with requirements of the North Carolina Department of Environment and Natural Resources.

32.

Unless Defendants are enjoined from further use of Plaintiff's equipment, Plaintiff's interest in the equipment will be significantly and permanently damaged thereby causing Plaintiff to suffer immediate and irreparable injury.

33.

Accordingly, Plaintiff respectfully requests this Court to enter a temporary restraining order preventing Defendants from using Plaintiff's equipment and from denying Plaintiff access to the equipment and an interlocutory injunction for same until further Order of this Court.

34.

After the interlocutory injunction is entered, and after a trial on the merits, the interlocutory injunction should be made permanent until such time as Plaintiff has, at its option, removed its equipment or received the costs for same from Defendants.

**COUNT IV – ATTORNEY'S FEES**

35.

Paragraphs 1 through 34 are incorporated herein by reference as if fully set forth herein.

36.

According to the terms of the Agreement and Lease, if a suit is brought to enforce same, the losing party agrees to pay all costs incurred by the prevailing party in connection with the suit, including reasonable attorney's fees.

37.

Defendants are hereby notified that unless the principal amount of the damages caused by their actions is paid in full within ten (10) days from Defendants receipt of this Complaint, the provisions of the Agreement and Lease obligating payment of attorneys' fees and expenses of litigation shall be enforced in accordance with O.C.G.A. § 13-1-11.

38.

Alternatively, since Defendants have acted in bad faith and caused the Plaintiff unnecessary trouble and expense and have been stubbornly litigious, Plaintiff is entitled to recover it's attorney's fees and expenses of litigation in an amount to be proved at trial pursuant to O.C.G.A. § 13-6-11.

**WHEREFORE,** Plaintiff prays to this Court for the following:

(a) That the Court enter a judgment in favor of Plaintiff against Defendant Solo on Count I of Plaintiff's Complaint in an amount to be proved at trial plus all interest which accrues through the date a judgment is entered in this action;

(b) That the Court enter a judgment in favor of Plaintiff against Defendant Jordan, individually, on Count II of Plaintiff's Complaint in an amount to be proved at trial plus all interest which accrues through the date a judgment is entered in this action;

(c) That the Court exercise its equitable powers and enter a temporary restraining order and interlocutory injunction prohibiting Defendants from using Plaintiff's equipment located on the Premises and prohibiting Defendants from denying Plaintiff access to its equipment until such time as Plaintiff, at its option, removes its equipment or receives the cost for same from Defendants;

(d) That the Court exercise its equitable powers and enter a permanent injunction prohibiting Defendants from using Plaintiff's equipment located on the

Premises and prohibiting Defendants from denying Plaintiff access to its equipment until such time as Plaintiff, at its option, removes its equipment or receives the cost for same from Defendants;

(e) That Plaintiff recover its attorney's fees and expenses of litigation for bringing this matter; and

(f) For such other relief as the Court deems just and proper.

Respectfully submitted this 28th day of May, 2009

By: [signature]

Wm. Bradford Puryear
Georgia Bar No. 590305
Matthew R. Girardot
Georgia Bar No. 296227
Mansfield Oil Company of Gainesville, Inc.

1025 Airport Parkway, S.W.
Gainesville, GA 30501
Telephone: (678) 450-2000

STATE OF GEORGIA

COUNTY OF HALL

VERIFICATION

PERSONALLY APPEARED before me, a Notary Public duly empowered to administer oaths, the undersigned Michael F. Mansfield, Sr. who, after first having been sworn, deposes and states on oath that he is the Chief Executive Officer of Mansfield Oil Company of Gainesville, Inc. and that the facts set forth in the foregoing **Complaint** are true and correct.

Michael F. Mansfield, Sr.

Sworn to and subscribed in my presence
this 28 day of May, 2009

NOTARY PUBLIC

[NOTARY SEAL]

# MANSFIELD RETAIL MARKETING AGREEMENT

This Mansfield Retail Marketing Agreement (the "Agreement") made and entered into on the 24 day of August 2005, by and between MANSFIELD OIL COMPANY OF GAINESVILLE, INC., a Georgia corporation, with its principal office located at 1025 Airport Industrial Parkway, SW Gainesville, Georgia 30501, hereinafter referred to as "Mansfield" and MARKET CENTER, INC. hereinafter referred to as "Marketer" with its principal office located at 3601 Sweeten Creek Road, Arden, NC 28704:

## WITNESSETH:

**WHEREAS,** the parties hereto have, contemporaneously with the execution of this document, entered into a Special Purpose Lease Agreement of even date herewith; and

**WHEREAS,** said Lease Agreement sets forth the agreement of the parties hereto for the lease by Mansfield from Marketer of certain lands either owned by Marketer or under lease by Marketer for a term of years; and

**WHEREAS,** said Lease Agreement sets forth the agreement of the parties hereto for the installation by Mansfield of certain petroleum marketing equipment on said lands leased by Mansfield; and

**WHEREAS,** the parties hereto are desirous of setting forth herein the terms under which various petroleum products will be sold from said Premises hereinafter referred to;

**NOW, THEREFORE,** for and in consideration of the mutual benefits flowing from each of the parties hereto and in further consideration of the payment of the sum of One ($1.00) Dollar by each party hereto unto the other, the receipt and sufficiency of which is hereby acknowledged and for other good and valuable considerations, the parties hereto do hereby enter into this Agreement on the following terms:

1. MARKETER'S DUTIES

Marketer agrees to sell Mansfield's petroleum products through Mansfield's petroleum dispensing equipment located at the Premises fronting on U.S. Highway 129 in Robbinsville, Graham County , North Carolina being more particularly described in **Exhibit "A"** hereto (hereinafter sometimes referred to as "the Premises") and to promote the sale of petroleum products therefrom during such hours as Marketer's retail business operated in conjunction therewith is open. The petroleum dispensing equipment shall be used solely for Mansfield's products. Marketer shall in connection with such operation and promotion provide at his expense all services and materials set out in **Exhibit "A"**, attached, including but not limited to, the following: (1) all labor necessary for the operation of said equipment and in cleaning the Premises on which such equipment is located, including the removal of all ice, snow and debris from such Premises, (2) stick readings and other monitoring of the volume of petroleum products in the underground tanks at such times as may be requested by Mansfield, (3) monitoring the use of the petroleum marketing equipment, (4) all reports, information and audits specified in this Agreement, (5) all lamp replacements, and (6) all utilities.



Exhibit "A"

2. TITLE TO PETROLEUM PRODUCTS

Title to all motor fuel, diesel fuel or other petroleum products (hereinafter "Motor Fuel" or "the Product") supplied hereunder by Mansfield shall remain in Mansfield until sold by Marketer to the retail consumer. At no time shall title to the Motor Fuel pass to Marketer.

3. EXCLUSIVE RIGHTS

It is specifically understood that subject to the provisions contained herein Marketer does hereby agree that Mansfield shall be the exclusive supplier of Motor Fuel to the Premises. In consideration of the substantial increase in value in Marketer's related business resulting from the investment by Mansfield of substantial funds and the purchase and maintenance of equipment to be installed on the Premises as well as the marketing expertise to be communicated by Mansfield to Marketer during the course of their relationship, Marketer warrants that Marketer will not permit the sale or distribution of Motor Fuel obtained from any source other than Mansfield from the Premises and will not permit the installation of any other Motor Fuel dispensing equipment on the Premises. In the event of breach of this provision by Marketer, Mansfield shall have, in addition to all other legal and equitable remedies, the right to obtain from any court of competent jurisdiction, an order requiring specific performance hereof and/or an injunction enjoining further violations hereof. During such time as the status of this Agreement or any part shall be contested, Marketer shall have no right to use, alter or remove any of the equipment installed on the Premises.

4. HOURS OF OPERATION

Marketer's retail business shall be open for business at least between the hours of 6:00 A.M. to 12:00 P.M., seven (7) days per week, and shall sell Mansfield's Motor Fuel during all hours of operation.

5. NATURE OF RETAIL BUSINESS

Marketer shall have the right to sell other products and provide services in addition to the sale of Motor Fuel from the Premises, provided such other goods or services do not compete with or adversely affect the sale of Mansfield's Motor Fuel and Mansfield shall receive no compensation for such other products or services. Marketer's retail business shall at all times include a "convenience store" and shall at all times sell the type and category of items currently sold in convenience stores, said items being those typically sold at convenience stores by Marketer's competitors in the convenience store business. Marketer's failure to maintain a convenience store on the Premises for any reason shall constitute a breach of this Agreement.

6. PUBLIC RESTROOMS

Marketer agrees to make public restrooms available for the use of store customers during all daily operating hours.

7. EMPLOYEES

The number of employees required for Marketer's operations hereunder, the selection of

such employees, the hours of labor and the compensation for services to be paid any and all such employees shall be determined by Marketer. Such employees shall be the employees of Marketer.

8. BEST EFFORTS

Marketer covenants and agrees to put forth its best efforts to sell Mansfield's Motor Fuel under the terms of this Agreement. Both parties agree that they will not commit any act during the original or any renewal term of this Agreement which might jeopardize the other party's right to occupy the Premises and shall endeavor in good faith to enable the other party to continue business at the location for as long as possible under advantageous conditions.

9. FIDUCIARY RESPONSIBILITY

Marketer shall collect the proceeds from the sale of Mansfield's Motor Fuel as an agent for Mansfield and shall owe to Mansfield the fiduciary duty in the handling of the proceeds collected on behalf of Mansfield as an agent of Mansfield.

10. COMPETITOR'S PRICE

Marketer shall keep abreast, on a daily basis, of the current pump prices for Motor Fuel of Marketer's competitors and report same to Mansfield on a daily basis.

11. CREDIT CARDS

Marketer acknowledges that a processing fee is charged by the credit card company on all credit card sales, which fee is a percentage of the amount of each credit card purchase. Such percentage is determined by each particular credit card company and is subject to change at the discretion of each particular credit card company. The credit cards to be used by Marketer and the current processing fee for each credit card are as follows:

| **Credit Card Company** | **Current Processing Fee** |
|---|---|
| MasterCard, VISA | 1.6% + $0.15 transaction fee |
| Discover, American Express | 3.25% |
| Debit Transactions | $0.30 per transaction |

Marketer shall be solely responsible for the processing fee for all non Motor Fuel purchases and such fees shall be deducted from Marketer's share of the Net Proceeds as defined in Paragraph 19(a) below. The processing fee for all Motor Fuel purchases shall be part of the Laid in Cost as set forth at Paragraph 19(a)(iv) below. Marketer shall verify all the manual credit card transactions regardless of the amount of purchase and Marketer shall be solely responsible for all charge backs in the event the credit card company determines that the verification process was not correctly followed and said credit card company does not pay for the amount of the purchase. Such charge backs shall be deducted from Marketer's share of the Net Proceeds as defined in Paragraph 19(a) below.

12. REPORTS AND INFORMATION

Marketer shall maintain accurate meter records from the Motor Fuel dispensing equipment and Mansfield shall be entitled, but not required, to inspect, repair and adjust said meter from time to time.

Marketer or Marketer's employees shall provide to Mansfield, on a daily basis, all information reasonably necessary to calculate and verify the previous day's transactions, said information to include, but not be limited to, current pump prices of Marketer's competitors, ending gallon and money figures, meter readings, pump tests, before and after stick readings for each delivery, hard copies of all automated and manual credit card transactions and current pump prices. Marketer shall provide such information every day, seven days a week by contacting Mansfield by phone, or any other means, including, but not limited to, telefax, voice mail, telex or in person. Marketer shall also provide said information every day, seven days a week, in writing, on a form to be provided by Mansfield.

Marketer shall be responsible to Mansfield for the payment of all additional freight charges and/or assessments incurred by Mansfield on account of any meter reading inaccurately reported by Marketer. If Marketer is responsible for reported errors, such additional charges shall be deducted from Marketer's share of the Net Proceeds as defined in Paragraph 19(a) below.

13. INVENTORY CONTROLS

(a) Marketer understands and acknowledges that the leakage of Motor Fuel from underground tanks and/or other Motor Fuel dispensing equipment is a concern and that as the operator of a retail facility, Marketer must take diligent and continual precautions to discover and stop any such leakage through adequate inventory control. Marketer agrees to keep and reconcile inventory records to indicate Motor Fuel losses. These records shall be maintained for each operating day and shall include the following information for each grade or type of Motor Fuel supplied: (1) opening physical inventory; (2) sales; (3) product used other than sold; (4) receipts; (5) closing physical inventory and (6) variation (over or short).

(b) Marketer agrees to promptly notify Mansfield orally (1) of any sudden, unexplained variance from his normal inventory pattern; (2) when relatively small losses are occurring but trending larger; (3) of any large increase of water in an underground tank; or (4) of any other suspicious circumstances whatsoever indicating an unexplained loss of product. Marketer shall confirm in writing to Mansfield any such oral notification within twenty-four (24) hours.

(c) Marketer agrees to perform water checks of the underground tanks on a weekly basis, on Thursday of each week and after each Motor Fuel delivery. Marketer shall provide the results to Mansfield on the day said water check is performed.

(d). Marketer agrees to retain daily inventory records for all underground tanks and to make such records available to Mansfield for inspection and copying during normal business hours.

(e) Marketer agrees to inspect the Motor Fuel product storage and handling facility, and surrounding areas at least once a week for indication of possible leakage. This inspection should

include, but is not limited to, careful visual review of the following areas: (1) around and under product dispensers; (2) inside remote pump access boxes; (3) inside product fill boxes and (4) areas such as hillsides or culverts. Any indication of leakage (actual product or odors thereof) must be reported promptly as stated above.

(f) Marketer specifically agrees to indemnify Mansfield and to hold it harmless from all cleanup costs, personal injury, death or property damage claims, and fines or penalties which arise out of or are related to any leakage or spills of Motor Fuel products, except to the extent caused by the negligence or willful misconduct of Mansfield.

14. MOTOR FUEL SPILLS

Employees of Marketer shall exercise reasonable care to observe all Motor Fuel operations and in the event of any Motor Fuel spill, shall immediately turn off Motor Fuel equipment and shall report the spill to Mansfield and to all appropriate emergency or administrative agencies such as, but not limited to, the fire department and the Environmental Protection Agency. Mansfield shall respond to any report of a spill and Marketer shall take all steps necessary to control the spill until such time as Mansfield can reasonably respond to said report. Marketer shall be responsible for any damages or losses resulting from any Motor Fuel spills caused by the failure of Marketer to exercise reasonable care in monitoring the Motor Fuel operations during the hours of operation of Marketer's retail business.

15. MOTOR FUEL SALES PRICE

All Motor Fuel furnished by Mansfield shall be sold by Marketer at prices established by Mansfield. Mansfield shall not set the price below cost unless Mansfield deems it necessary in order to match direct competition. Upon notification by Mansfield of any change in price, Marketer shall change the price at the time specified by Mansfield on all price signs and on all pumping equipment.

16. DELIVERIES OF MOTOR FUEL

Marketer shall take stick readings immediately before and immediately after each delivery of Motor Fuel to the Premises and Marketer shall sign the Terminal Bill of Lading for each such delivery. The signed Terminal Bills of Lading for each delivery shall be provided to Mansfield on a weekly basis. The stick readings for each delivery shall be provided on a daily basis as set out in Paragraph 12. Mansfield shall have the option, in its sole discretion, to deliver the Motor Fuel after hours when the Premises are not open for business and at such times as Mansfield exercises this option, the requirement of this Paragraph, for that particular delivery only, shall be waived.

17. TRADEMARK RIGHTS

Mansfield shall have the sole right to determine which trademark or trade names are applied to the products distributed from the Premises. Nothing in this Agreement shall be construed to give Marketer any interest in the trademarks of Mansfield, or the trade name or style of Mansfield or any other trademark or trade name authorized to be used on the Premises by Mansfield except the right to use them under and pursuant to the terms of this Agreement and only so long as this Agreement

remains in effect. Mansfield may contract with a branded or unbranded supplier and may thereafter utilize as its own, the branded name of the supplier or any other trademark or trade name at the Premises regardless of the origination of the Product. Mansfield shall have the right to place such decals and insignia on and otherwise to identify and mark all equipment and all Motor Fuel at the Premises with such identification as Mansfield shall determine. Mansfield shall also have the right to change brands or to unbrand the location, at anytime, in its sole discretion.

18. ADVERTISING

Marketer agrees that it will not make any representations concerning the Motor Fuel sold hereunder, nor permit any of Marketer's employees to make any representations not previously approved in writing by Mansfield. Any advertising in publications or otherwise which Marketer or his employees intend to use in the promotion of the sale of Motor Fuel hereunder shall be submitted to Mansfield for its prior approval in writing before the use or dissemination of the same.

19. COMPENSATION

(a) The parties shall divide the Net Proceeds per gallon for all Motor Fuel sold from the Premises as follows: Fifty percent (50%) to Mansfield and Fifty percent (50%) to Marketer. Net Proceeds is defined for purposes of this Agreement as the difference between the Laid in Cost and the retail price paid by the retail customer. Laid in Cost, as used herein shall be the total of:

(i) The posted rack or terminal cost of the Motor Fuel;
(ii) Any and all city, county, state and federal taxes thereon;
(iii) Freight charges incurred from the terminal to the Marketer's Premises;
(iv) Any and all charges including processing fees associated with the use of credit cards for purchase of Mansfield's Motor Fuels excluding "charge backs" and excluding charges for non Motor Fuel purchases as discussed in Paragraph 11 of this Agreement.
(v) Any other miscellaneous fees, including but not limited to, inspection fees, "doing business" fees, surcharges, temporarily levied EPA spill fees, assessed against Mansfield or against the Motor Fuel, other than any costs or fees assessed due to Mansfield's negligence.

(b) On or before the 20th day following deposit of the proceeds of all Motor Fuel from the previous month and receipt by Mansfield of all sales reports for the previous month Mansfield shall, unless delayed by factors reasonably beyond its control, deposit in United States Mail a check payable to Marketer for Marketer's share of the Net Proceeds for the previous calendar month's sale calculated as herein provided. Mansfield shall do the accounting for sales and shall provide Marketer a statement thereof at the same time that the Net Proceeds check is distributed. In the event that Marketer is indebted to Mansfield for any sums whatsoever, Mansfield may, at its option, apply all or any portion of the aforesaid share of Marketer to such indebtedness until the same is paid and thereafter Mansfield shall resume disbursement directly to Marketer. In addition, Mansfield shall have the option of demanding payment in full from Marketer, which payment shall be due no later than ten (10) days from the date of said demand.

20. MINIMUM ANNUAL PROFIT

Mansfield reserves the right to terminate this Agreement, upon thirty (30) days written

notice, in the event that Mansfield's share of the Net Proceeds, as calculated pursuant to Paragraph 19, is less than $8,000.00 in any calendar year during the term of this Agreement.

21. ACCOUNTING AND PAYMENT

No later than 2:00 p.m. Eastern Standard time on each banking day Marketer shall:

(a) Deposit one hundred percent (100%) of the gross proceeds of the previous day's sale of Motor Fuel at the Premises in cash in a bank account in Mansfield's name, subject to final computation of compensation, reconciliation, and distribution of funds as set forth in Paragraph 19 of this Agreement. Such bank account shall be set up by Mansfield at a bank of its choice.

(b) Inform Mansfield's designated agent of the amount of said deposit and the amount of all automated and manual credit card transactions for the previous day; and

(c) Further report all sales, automated credit card transactions and manual credit card transactions in a format as Mansfield may require herein or from time to time. Marketer shall strictly comply with the foregoing provisions for the handling and reporting of sales and failure to do so shall authorize Mansfield, in addition to such other remedies as may be available to it under the law, to lock the equipment, or withhold further deliveries of Product until it receives adequate assurances that Marketer will perform those duties in the future. Marketer shall pay, to defray administrative costs incurred by Mansfield, the sum of Fifty and No/100 Dollars ($50.00) per day for each day that any such sums are withheld from deposit and reports are not given as required. Such administrative fee shall be in addition to any liquidated damages that may be due pursuant to Paragraph 27(f) below. Marketer shall be solely liable to Mansfield for any loss, stolen or unexplained shortages of monies collected.

22. INSURANCE PROVIDED BY MARKETER

Marketer shall provide, continuously during the performance of this Agreement, in reliable insurance companies acceptable to Mansfield and authorized to do business in this State, the following minimum insurance coverages:

(a) Employer's Liability and Worker's Compensation Insurance covering the employees of Marketer engaged in operations hereunder, in compliance with the laws of this State; and

(b) General Public Liability Insurance insuring the parties hereto against loss or damages claimed by any other person, firm or corporation arising out of or in connection with all operations conducted by Marketer hereunder, which policy shall have minimum limits for bodily injury or death of not less than $1,000,000.00 for injuries to, or death of, any one person, and not less than $3,000,000.00 for injuries to, or death of, more than one person resulting from any one accident, and for property damage with a limit of not less than $500,000.00 for damage to property for each accident. Marketer shall also have Mansfield named as an additional insured on such liability insurance policy.

(c) Prior to the commencement of work, Marketer shall furnish Mansfield with a

certificate or certificates evidencing that it is carrying the insurance provided for above, and such insurance shall contain provisions that no cancellation or material changes in the policy shall become effective except upon thirty (30) days written advance notice thereof to Mansfield.

23. INSURANCE PROVIDED BY MANSFIELD

Mansfield shall provide, continuously during the performance of this Agreement, in reliable insurance companies acceptable to Marketer and authorized to do business in this State, the following minimum insurance coverages:

General Public Liability Insurance insuring the parties hereto against loss or damages claimed by any other person, firm or corporation arising out of or in connection with all operations conducted by Mansfield hereunder, which policy shall have minimum limits for bodily injury or death of not less than $1,000,000.00 for injuries to, or death of, any one person, and not less than $3,000,000.00 for injuries to, or death of, more than one person resulting from any one accident and for property damage with a limit of not less than $500,000.00 for damage to property for each accident. Mansfield shall also have Marketer named as an additional insured on such liability insurance policy.

Prior to the commencement of work, Mansfield shall furnish Marketer with a certificate or certificates evidencing that it is carrying the insurance provided for above, and such insurance shall contain provisions that no cancellation or material changes in the policy shall become effective except upon thirty (30) days written advance notice thereof to Marketer.

24. INDEMNIFICATION

Marketer agrees to protect, indemnify and hold Mansfield free and harmless from and against any and all claims, liens, demands, actions and causes of action of every kind and character, including the amount of judgment, penalties, interest, court costs and legal fees incurred by Mansfield in defense of same, arising in favor of any other person, firm or corporation or governmental agencies (including Marketer, his agents and employees and his subcontractors) on account of all matters, incidents, claims, demands or judgments of every character occurring or in anywise incident to, in connection with, or arising out of the work to be performed by Marketer hereunder, except insofar as responsibility may be expressly assumed by Mansfield under and/or the provisions of this Agreement. Marketer shall provide contractual liability insurance with limits of not less than those limits specified in Paragraph 22 above to assure Mansfield of Marketer's ability to so indemnify Mansfield.

Mansfield agrees to protect, indemnify and hold Marketer free and harmless from and against any and all claims, liens, demands, actions and causes of action of every kind and character, including the amount of judgment, penalties, interest, court costs and legal fees incurred by Marketer in defense of same, arising in favor of any other person, firm or corporation or governmental agencies (including Mansfield. its agents and employees and its subcontractors) on account of all matters, incidents, claims, demands or judgments of every character occurring or in anywise incident to, in connection with, or arising out of the work to be performed by Mansfield hereunder. Mansfield shall provide contractual liability insurance with limits of not less than those limits specified in Paragraph 22 above to assure Marketer of Mansfield's ability to so indemnify

Marketer.

25. MAINTENANCE OF EQUIPMENT

The Motor Fuel dispensing and marketing equipment located on the Premises owned by each party, shall at all times remain in good working order and each party shall be responsible for maintenance of the equipment it owns.

Marketer understands and agrees that it is the responsibility of the Marketer to maintain cleanliness of the Premises and the Motor Fuel dispensing equipment at a level acceptable to Mansfield. The acceptable level to Mansfield is defined as a minimum score of 80% in the Mansfield "Image Evaluation Report" shown as **Exhibit "B"** to this Agreement. Also, the Marketer understands that this standard "Image Evaluation Report" may be modified from time to time to meet current market and competitive conditions. Marketer further agrees to clean the Motor Fuel dispensing equipment on a daily basis by following Motor Fuel dispensing equipment cleaning procedures as defined in Mansfield Oil's "Retail Marketing Manual" shown as **Exhibit "C"** to this Agreement which may be modified from time to time to meet competitive conditions and changing equipment requirements. Provided however that Mansfield agrees that any modifications of either the "Image Evaluation Report" or the "Retail Marketing Manual" shall be applicable to all stores to which Mansfield supplies Motor Fuel and that are subject to the Image Evaluation Report. Marketer shall have the right to inspect the Motor Fuel dispensing equipment at any time, without prior notice. In the event that Marketer fails to properly clean the Motor Fuel dispensing equipment on a daily basis, Mansfield shall have the right to hire a third party to clean the Motor Fuel Dispensing Equipment and the cost of same shall be paid by Marketer and Mansfield shall have the right to deduct such cost from any amount due Marketer from Mansfield pursuant to this Agreement.

Marketer shall notify Mansfield of any malfunction or other problem or problems with the equipment owned by Mansfield within at least twenty-four (24) hours of the malfunction or other problem. Failure of Marketer to so notify Mansfield shall render Marketer liable for any damages or losses resulting therefrom, and Marketer agrees to indemnify and hold Mansfield harmless against any damages, losses, and expenses, including reasonable attorney's fees as a result thereof. Marketer shall make the equipment owned by Mansfield available to Mansfield and all repair personnel supplied by Mansfield at any time Mansfield, in its discretion, shall request for making necessary repairs to its equipment.

Marketer shall notify Mansfield, in writing, of all maintenance and repairs which it deems necessary to be performed by Mansfield pursuant to this paragraph. If Mansfield is responsible pursuant to this paragraph for such repairs and maintenance, Mansfield shall perform said repairs and maintenance, within a reasonable time, taking into account the severity of the problem and the supplies, material and labor required.

Marketer shall be solely responsible for any contamination of the Motor Fuel provided by Mansfield if such contamination is the result of the actions or non-action of Marketer, his employees, contractors, or agents, such as, but not limited to, the failure to keep the underground storage tanks properly secured, to keep watertight fill caps and/or the ground level lids covering the overfill containment unit properly secured.

26. PADLOCKS

Mansfield shall have the option, in its sole discretion, to require the use of padlocks on the Motor Fuel tanks.

27. TERM

(a) Initial Term: This Agreement shall be for an initial term of twenty (20) years beginning the 25 day of February 2005 and expiring on the 24 day of February, 2025.

(b) Option to Extend: Mansfield shall have and is hereby granted by Marketer, the exclusive right and option to renew this Agreement on the same terms and conditions as for the initial term, for one (1) additional five (5) year term. Such option shall be automatically exercised by Mansfield without any further action by Mansfield unless Mansfield shall give written notice to Marketer at least thirty (30) days prior to the expiration of the initial term hereof that Mansfield does not desire for said option to be exercised and the term extended.

(c) Subsequent Years: Upon the expiration of the option terms hereof, this Agreement shall continue on a year to year basis on the same terms and conditions as for the initial and option terms subject to the right of either party to terminate this Agreement at the end of the option terms or any succeeding yearly period by written notice of termination to the other party given at least thirty (30) days prior to the end of the option term or any anniversary date hereof thereafter. Upon termination, Marketer shall have the right to purchase Mansfield's Motor Fuel equipment at its then market value as determined by mutual agreement of the parties. If the parties cannot agree, Mansfield shall select one appraiser to value the Motor Fuel equipment and Marketer shall select a second appraiser to value the Motor Fuel equipment. If the two values do not agree, then the two appraisers shall select a third appraiser whose appraisal will govern the value of the Motor Fuel equipment. If Marketer does not exercise its right to purchase the Motor Fuel equipment, Mansfield shall have the option to either remove same, or abandon same, in Mansfield's sole discretion.

(d) Preservation of Leasehold: In the event Marketer does not own the fee title to the lands involved in this Agreement but rather holds a leasehold interest, then Marketer hereby agrees to preserve Marketer's leasehold interest in the Premises in order to assure that this option may be exercised. Termination of this Agreement shall not discharge either party of its duties and obligations accruing prior to termination.

(e) Default: In the event either party defaults in the performance of its duties and/or obligations hereunder and such default is not corrected within ten (10) days after notice thereof from the other party, then the party giving notice of such default shall have the right to terminate this Agreement upon delivering written notice of such termination to the other party.

(f) Liquidated Damages if Marketer Defaults: It is agreed by the parties that because Mansfield will invest substantial funds for the purchase and maintenance of equipment

to be installed on the Premises pursuant to this Agreement, Mansfield shall be entitled to the following liquidated damages in the event Marketer is in breach of this Agreement. The liquidated damages provided for below are intended to provide for damages rather than a penalty and are a reasonable pre-estimate of the probable loss to Mansfield, the actual loss being difficult or impossible of more precise determination. Upon Marketer's default, Marketer shall pay to Mansfield liquidated damages in the amount of $500.00 per day for each day Marketer is in default until such time as Marketer has corrected such default. In the event of termination resulting from Marketer's default, Mansfield shall be entitled to recover all damages as authorized by law.

28. AUDITS

Mansfield shall have access to the Premises covered hereby and to Marketer's convenience store at all times to inspect and observe Motor Fuel Sales operations thereon and to take inventories, and shall have access at all reasonable times to information pertaining to the operation thereof, including Marketer's books and records relating thereto. Marketer shall submit to Mansfield a monthly profit or loss statement in a Mansfield approved format no later than thirty (30) days after the close of each month. Marketer shall submit to Mansfield as Mansfield may reasonably request, but at least on an annual basis, not more than ninety (90) days after the end of the calendar or fiscal year end of Marketer a comprehensive financial statement in a Mansfield approved format which shall include, but not be limited to, information showing the total amount of Motor Fuel sold, the amounts of monies received therefor and the amounts of all commissions received.

Upon termination of this Agreement, an audit of Motor Fuel inventory and sales will be completed at the Premises under the joint supervision of Marketer and Mansfield or their designees and the original copy of such audit will be forwarded to Mansfield where the audit will be concluded and Marketer's account totaled. Mansfield shall then provide Marketer copies of invoices to support such concluded audit. Upon final determination of the balance in Marketer's account, Mansfield shall immediately pay any credit balance due to Marketer. In the event that the final balance shows that Marketer is indebted to Mansfield, Mansfield shall have the right to deduct such balance from any other account owed to Marketer. If, after making all proper deductions, there is a balance owing to Mansfield, Marketer will immediately pay said balance in full to Mansfield.

29. OPTION TO PURCHASE THE PREMISES

Mansfield shall have and hereby is granted the right of first refusal to purchase the Premises on terms equal to the terms at which said Premises are offered for sale to others before the Premises are sold to any other person or entity. It is agreed that this right of first refusal in no way affects Marketer's obligation to preserve Mansfield's right to renew this Agreement at its option as set out in Paragraph 27.

30. INDEPENDENT CONTRACTOR

It is agreed and understood that Marketer is not an employee of Mansfield but rather is an

independent contractor with full power and authority, except as may be specifically provided otherwise herein, to select the means, methods, and manner of performing the work he is to perform under this Agreement, Mansfield being interested only in the results obtained.

31. GOVERNMENTAL REGULATION

Both parties shall strictly conform to any and all rules, regulations, laws or other requirements promulgated by the Environmental Protection Agency or any similar state or federal agency having authority applicable to the purposes of this Agreement, as those regulations presently exist or as the same may hereafter be amended or expanded. Failure by either party to strictly conform to such present and future rules and regulations during the term of this Agreement or any extension thereof shall constitute a condition of default hereunder and thereafter the defaulting party shall hold the other party harmless against any losses or forfeitures or other costs resulting therefrom. Both parties shall be responsible for keeping abreast of such rules, regulations and laws and neither party shall be required to convey such information to the other party.

32. FORCE MAJEURE

If either party is rendered unable, wholly or in part, by force majeure or any other cause of any kind not reasonably within its control, to perform or comply with any obligation or condition of this Agreement, upon giving notice and reasonably full particulars to the other party, such obligations or conditions shall be suspended during the continuance of the inability so caused and such party shall be relieved of liability and shall suffer no prejudice for failure to perform the same during such period; provided, however, that obligations to make payments then due hereunder shall not be suspended. The cause of any such suspension (other than strikes or differences with workmen) shall be remedied so far as possible with reasonable dispatch. Settlement of strikes and differences with workmen shall be wholly within the discretion of the party having the difficulty. The term "force majeure" shall include without limitation by the following enumeration, acts of God and the public enemy, the elements, fire, accidents, breakdowns, strikes and any other industrial, civil or public disturbance, inability to obtain water, motor fuel or power due to shortage of supply or embargoes by any country or state, and any laws, orders, rules, regulations, and acts or restraints of any governmental body or authority, civil or military.

33. SHORTAGE OF SUPPLY

At any particular time Mansfield may not have sufficient supplies of Motor Fuel from its sources of supply to meet the requirements of all of its customers and of Mansfield for its own use. Whenever that situation exists, Mansfield shall have the right, in addition to any other rights it may have under this Agreement, to reduce deliveries to Marketer on any basis, which in Mansfield's opinion is equitable, to such classes of customers as Mansfield deems appropriate. No such reduction need be made up. However, if such shortage occurs, Mansfield shall so notify Marketer and if Marketer is able to secure appropriate fuel supply from another source, then Marketer shall notify Mansfield of the other supply source and upon Mansfield's consent, Mansfield shall purchase fuel from such supplier until Mansfield can otherwise obtain supply.

34. ASSIGNMENT

Marketer may assign its interest in this Agreement provided the Assignee meets Mansfield's credit approval.

35. INSTALLATION OF EQUIPMENT

If, during the course of preparations for the installation of the equipment to be installed by Mansfield, unforeseen circumstances are discovered pursuant to the examination and analysis of core samples or other means as to the condition of the soil or earth at the installation site, such as, but not limited to, contamination, underground water or the existence of rock deposits, which condition of soil or earth will necessitate expenditures for purposes of installation in excess of ten percent (10%) of the anticipated costs of such installation before discovery of the unforeseen condition, then and in that event Mansfield shall have the right and option of declaring this Agreement null and void, whereupon Mansfield shall have no further obligation to Marketer.

36. WAIVER

No waiver by Mansfield or Marketer of any default of the other under this Agreement shall operate as a waiver of any future default whether of a like or different character.

37. NOTICE

Every notice, request, statement or bill provided for in this Agreement shall be in writing directed to the party to whom given, made or delivered at such party's address as follows:

MANSFIELD: Mansfield Oil Company of Gainesville, Inc.
1025 Airport Parkway, SW
Gainesville, GA 30501
Attention: Michael F. Mansfield, President

MARKETER: Market Center, Inc.
3601 Sweeten Creek Road
Arden, NC 28704
Attention: Andy Patton Jordan

or at such other address as such party may from time to time designate as the address for such purpose by registered letter addressed to the other party.

38. BINDING EFFECT

This Agreement shall be binding on the heirs and personal representatives of Marketer and in the event any valid assignment hereof is made by Marketer and consented to by Mansfield, then this Agreement shall be binding on the assignees and transferees of Marketer. This Agreement shall be binding on the successors and assigns of Mansfield.

39. ATTORNEY FEES

If suit is brought by either party for recovery of any payment due under this Agreement or for the breach of any provision of this Agreement, the losing party agrees to pay all costs incurred by the prevailing party in connection with such suit, including reasonable attorney fees.

40. ENTIRE AGREEMENT

This Agreement and the Special Purpose Lease Agreement of even date herewith between the parties hereto, constitutes the entire agreement between the parties and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect.

41. SEVERABILITY

If any provision of this Agreement is invalid or unenforceable under applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only, without invalidating or otherwise affecting the remainder of this Agreement.

42. GOVERNING LAW

This Agreement shall be governed by the substantive laws of the State of Georgia, without reference to its conflicts of law provisions.

43. JURISDICTION

All disputes shall be resolved in Hall County, Georgia, and Marketer hereby submits to the jurisdiction of the courts of Hall County, Georgia and hereby agrees that venue is proper in Hall County, Georgia.

44. SPECIAL STIPULATIONS

Any special stipulations with respect to this Agreement are attached hereto as **Exhibit "D."** In the event of any conflict between the provisions of the Agreement and the special stipulations set forth on **Exhibit "D,"** the special stipulations shall prevail.

[SIGNATURES ON FOLLOWING PAGE]

**IN WITNESS WHEREOF,** this RMA is executed in duplicate originals on the date set forth below.

Signed, sealed and delivered in the presence of:

[signature]
Witness

[signature] Lynn S. Fink
Notary Public
My Commission Expires:

(SEAL) LYNN S. FINK NOTARY GEORGIA EXPIRES June 1, 2007 PUBLIC LUMPKIN COUNTY

MANSFIELD OIL COMPANY OF GAINESVILLE, INC.

By: [signature]

Name: JOHN BOYD

Title: Sr VP

Date: 8-24-05

ATTEST: [signature]

Name: Richard Pferick

Title: CFO

(CORPORATE SEAL AFFIXED)

Signed, sealed and delivered in the presence of:

[signature]
Witness

[signature] Janice Thomas
Notary Public
My Commission Expires: 11-08-05

(SEAL)

JANICE THOMAS NOTARY PUBLIC ... COUNTY, NC My ... Expires November 8, 2005

MARKETER: MARKET CENTER, INC.

By: [signature]

Name: Andy Jordan

Title: VP / Sec

Date: 2-25-05

ATTEST: [signature]

Name: Andy Jordan

Title: VP / Sec

(CORPORATE SEAL AFFIXED)

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

The above and foregoing Mansfield Retail Marketing Agreement is hereby personally guaranteed by the undersigned Guarantor, as an individual.

Signed, sealed and delivered
in the presence of:

______________________ By: ______________________
Witness Andy Patton Jordan

______________________
Notary Public
My Commission Expires: 11-08-05
(SEAL)

JANICE THOMAS
NOTARY PUBLIC
HENDERSON COUNTY, NC
My Commission Expires November 8, 2005

**Exhibit "A"**
**to**
**Mansfield Retail Marketing Agreement**

**LEGAL DESCRIPTION**

LEGAL DESCRIPTION
(PARCEL 1 & 2)

BEGINNING AT AN IRON PIN (P.O.B.) ON THE NORTHERN RIGHT-OF-WAY OF U.S. HIGHWAY NO. 129, WHICH IRON PIN IS ±587 FEET FROM SWEETWATER ROAD, THENCE WITH THE NORTHERN RIGHT-OF-WAY OF U.S. HIGHWAY NO. 129 THE FOLLOWING TWO COURSES AND DISTANCES: WITH A CURVE WHOSE RADIUS IS 2,261.11 FEET A CHORD OF N44-41-59W 86.07 FEET TO AN IRON PIN, THENCE N46-03-18W 120.15 FEET TO A NAIL, THENCE LEAVING THE NORTHERN RIGHT-OF-WAY OF U.S. HIGHWAY NO. 29 AND WITH THE PROPERTY NOW OR FORMERLY PHILLIPS REAL ESTATE, LLC THE FOLLOWING TWO COURSES AND DISTANCES: N43-13-11E 305.06 FEET TO A NAIL, THENCE S46-46-49E 214.04 FEET TO AN IRON PIN, THENCE WITH A NEW LINE ACROSS THE PROPERTY NOW OR FORMERLY UNITED COMMUNITY BANK THE FOLLOWING THREE COURSES AND DISTANCES: S46-46-49E 29.96 FEET TO AN IRON PIN, THENCE S43-13-11W 178.33 FEET TO AN IRON PIN, THENCE S59-48-41W 34.20 FEET TO AN IRON PIN, THENCE WITH THE PROPERTY NOW OR FORMERLY CHEROKEE REALTY & CONSTRUCTION THE FOLLOWING TWO COURSES AND DISTANCES: N42-58-00W 37.54 FEET TO AN OLD IRON PIN, THENCE S37-55-24W 101.53 FEET TO THE POINT OF BEGINNING CONTAINING 1.62 ACRES OR 70,555 SQUARE FEET.

L/C: 032-1311

**Exhibit "B"**
**to**
**Mansfield Retail Marketing Agreement**

**IMAGE EVALUATION INSPECTION**

**Will be provided at the time operator completes the MOC Training Program**

**Exhibit "C"**
**to**
**Mansfield Retail Marketing Agreement**

## RETAIL MARKETING MANUAL

**Will be provided at the time operator completes the MOC Training Program**

**Exhibit "D"**
**to**
**Mansfield Retail Marketing Agreement**

## SPECIAL STIPULATIONS

1. Mansfield shall install petroleum equipment, including four (4) multi-pump dispensers (MPDs), not five (5), and the SOLO image, as set forth in the Scope of Work (which shall be provided by Mansfield upon Mansfield's receipt and approval of the final civil and architectural engineering plans for the property) and attached hereto as Exhibit D-1. Lessor shall approve the Scope of Work in writing prior to commencement of installation.
2. Lessor shall provide electric power and breakers for wiring tie in for all petroleum equipment and SOLO image installation on the Premises.
3. In the event that fuel sales at the Premises exceed 200,000 gallons per month for six (6) consecutive months, then Mansfield will cause a fifth (5th) MPD to be installed within six (6) months thereafter.
4. If the RMA relationship is terminated for any reason, then upon termination Mansfield shall be entitled to either remove its equipment or require Market Center, Inc. to purchase the equipment for Mansfield's cost in the equipment, which is estimated at $280,000.00, but which shall be set forth in the Scope of Work to be provided by Mansfield, and Mansfield's cost of any additional improvements. Additionally, Mansfield shall be entitled to recover any liquidated damages as allowed in the Agreement.
5. This Agreement is contingent upon a title exam being conducted and acceptable to Mansfield, confirming the description and ownership of the Premises, which title search shall be scheduled by Mansfield and paid for by Marketer. The cost of the title exam shall not exceed $500.00.
6. This Agreement is subject to the approval of Mansfield's credit department.
7. This Agreement is contingent upon Mansfield's review and consent to the McDonald's agreements pertaining to the Premises.
8. This Agreement is contingent upon the proper execution of the Special Purpose Lease, Consent Agreement to Special Purpose Lease and Memorandum of Lease.
9. The location, including the McDonald's store at the Premises shall open on or before October 1, 2005. Marketer shall notify Mansfield on or before May 1, 2005, of the projected opening date of the facility. Mansfield will coordinate its petroleum equipment construction to be completed on or before the projected opening date.
10. The parties must receive McDonald's written agreement that McDonald's will locate on the Premises on or before the expected opening date set forth above.
11. For any calendar month in which the location sells more than 145,000 gallons of gasoline, then Marketer shall receive 60% of the Net Proceeds for that month. The additional proceeds (over the normal 50% ) shall be payable by Mansfield twice per year: April 30th for additional proceeds earned from the previous October – March 31; and October 30th for additional proceeds earned from April – September 30.

Exhibit D-1
Scope of Work

**1. Petroleum Equipment provided by Mansfield (specific details and cost will be available after engineering plans received and approved by Mansfield).**

- Furnish and install new underground storage tanks and tank pumping equipment.
- Furnish and install new double wall flexible hose piping.
- Furnish and install new MPD's (Multi-Product Dispensers) with PA (public address) system.
- Furnish and install new hoses, nozzles, and Safe-T-Breaks.
- Furnish and install dispenser sumps, island forms, crash barriers, etc.
- Furnish and install new gasoline canopy, and canopy footers with associated canopy lighting.
- Furnish concrete tank pad and concrete canopy pad.
- Furnish and install console and printer to accompany gasoline dispensing equipment.
- All new equipment to be maintained and owned by Mansfield.

**2. SOLO Brand/Imaging to be provided by Mansfield:**

- Schedule and install all imaging materials at our expense.
- Supply and install an internally illuminated SOLO Twin pole sign system to include three product panels, change pole, and sign footers (subject to local permitting).
- Furnish paint and labor to paint gasoline curbing.
- Furnish paint and labor to paint canopy columns.
- Furnish paint and labor to paint crash barriers.
- Furnish and install SOLO dispenser decals.
- Furnish and install octane stickers and any required regulatory signage.
- Furnish and install three (3) SOLO logos for canopy and all other SOLO marks and image decals.
- Furnish and install windshield washer stations.

Approved by Marketer:

By: [signature]

Title: VP/Sec

Date: 2-25-05

# SPECIAL PURPOSE LEASE

STATE OF NORTH CAROLINA,

COUNTY OF GRAHAM

This Special Purpose Lease (the "Special Purpose Lease" or the "Lease") made and entered into on the 24 day of August, 2005, by and between **Market Center, Inc.,** a North Carolina corporation, with an address of 3601 Sweeten Creek Road, Arden, NC 28704, hereinafter referred to as "Lessor", and **Mansfield Oil Company of Gainesville, Inc.,** a Georgia corporation, with an address of 1025 Airport Parkway, SW, Gainesville, GA 30501, hereafter referred to as "Lessee".

**WITNESSETH:**

**WHEREAS,** the parties hereto have contemporaneously with the execution of this instrument, entered into a certain Agreement known as "Mansfield Retail Marketing Agreement" dated of even date herewith (hereinafter referred to as the "Marketing Agreement") which Marketing Agreement covers the sale of motor fuel from the premises located at U.S Highway 129 in the City of Robbinsville, County of Graham, State of North Carolina;

**WHEREAS,** Lessor leases the subject property from Phillips Real Estate, LLC and hereby seeks to sublease a portion of the property to Lessee;

**WHEREAS,** the parties hereto desire to set forth herein, their agreement for the lease by Lessor to Lessee of certain lands hereinafter described and the installation by Lessee of certain equipment in and on said lands;

**NOW, THEREFORE,** for and in consideration of the mutual benefits flowing from each of the parties hereto unto the other and in further consideration of the payment of the sum of One ($1.00) Dollar by each party hereto unto the other the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby enter into this Special Purpose Lease on the following terms:

## 1. PROPERTY LEASE AND TERM

Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, for the special purpose and limited uses described herein, such portion (which portion is hereinafter sometimes referred to as the "Leased Premises") of the following described property as is necessary to allow Lessee to install, maintain and operate Lessee's motor fuel, pumps, tanks, machinery, apparatus, pumping, metering and related equipment (hereinafter "Motor Fuel Equipment") on and in said property described in the attached **Exhibit "A"** which exhibit is by this reference incorporated herein and made a part hereof (the total of the property described in said **Exhibit "A"** being hereinafter sometimes referred to as the "Property" or the "Premises"):

(a) Initial Term: The initial term of this Lease shall be for a term of twenty (20) years beginning the ~~1st day of January, 2005~~ 25th day of February, 2005 and expiring on the ~~31st day of December, 2024~~ 24th day of February, 2025:

(b) Option to Extend: Lessee is hereby granted by Lessor the exclusive right and option to extend this Lease on the same terms and conditions as for the initial term, for one (1) additional five (5)

Exhibit "B"

year term, with such term expiring on the ~~31st~~ 24th day of ~~December, 2029.~~ February, 2030 Such option shall be automatically exercised by Lessee without any further action by Lessee unless Lessee shall give written notice to Lessor at least ninety (90) days prior to the expiration of the initial term hereof that Lessee does not desire for said option to be exercised and the term extended.

(c) Subsequent Years: Upon the expiration of the option term hereof, this Lease shall continue on a year to year basis on the same terms and conditions as for the initial and option term subject to the right of either party to terminate this Lease at the end of the option term or any succeeding yearly period by written notice of termination to the other party given at least ninety (90) days prior to the end of the option term or any anniversary date hereof thereafter.

(d) Marketing Agreement term. Should the Marketing Agreement terminate, fail to extend, be deemed in default, or end for any reason, then Lessee shall have the option to terminate this Special Purpose Lease.

## 2. SPECIAL USE

Lessee shall have the exclusive right during the term of this Lease to use the Leased Premises including the Motor Fuel Equipment to be supplied by Lessee as discussed in Paragraph 3 below for the purpose of selling motor fuel. Lessor shall not permit the installation of any other motor fuel dispensing equipment on any portion of the Property described at **Exhibit "A"** attached hereto. Lessor reserves the right to continue to use the Leased Premises for the operation of a retail business so long as its operation remains a "convenience store" as described in the Marketing Agreement.

## 3. IMPROVEMENTS

Improvements by Lessee: In consideration of this Lease, Lessee agrees to install certain Motor Fuel Equipment on and in the Leased Premises. Lessee agrees to commence said installation within a timely manner, and to continue the same with due diligence until completed. Lessor reserves the right to inspect the installation. Upon the completion of said installation, a list of the installed Motor Fuel Equipment shall be signed and dated by both parties and shall be attached and incorporated into this Lease as **Exhibit "B"**.

## 4. RENTAL

The parties agree that the consideration for this Lease flows from the Marketing Agreement and therefore Lessor shall not be entitled to any additional amount as rent.

## 5. LESSEE'S EQUIPMENT

All Motor Fuel Equipment furnished and installed by Lessee in or on the Leased Premises at any time during the term hereof or any extension shall be and remain the sole property of Lessee, and shall be considered at all times the personal property of Lessee. If the Leased Premises, or any of Lessor's property thereon has been pledged as security by Lessor for any debt owed by Lessor, Lessor agrees to obtain any and all subordination agreements, exclusion statements, or other instruments as may be necessary or as may be required by Lessee to protect Lessee's interest in the equipment installed by Lessee on and in the Leased Premises. Lessor shall be entitled to purchase said Motor Fuel Equipment only as set forth in the Marketing Agreement.

6. TAXES

Lessor shall pay all taxes and assessments, general and special, upon the Leased Premises and on all machinery, apparatus, equipment and inventory owned by Lessor and Lessee shall pay all taxes and assessments on the Motor Fuel Equipment owned by Lessee and located on the Leased Premises. Upon Lessee's written request, Lessor will furnish Lessee annually, official tax receipts or true copies thereof showing payment before delinquency of all taxes and assessments levied on the Leased Premises.

7. WARRANTY

Lessor hereby fully warrants that the entity leasing the subject property to Lessor has title to the Leased Premises and will provide, at Mansfield's option, evidence of clear title in the form of a title certificate furnished by a qualified attorney and will defend the same against all claims of all persons, and agrees that Lessee shall have the right at any time to redeem for Lessor by payment, any mortgage debt, taxes, or other liens thereon in the event of default by Lessor and be subrogated to the rights of the holder thereof and may deduct any such payments from any amount due Lessor from Lessee pursuant to the Marketing Agreement or for any other reason, in addition to all other rights and remedies afforded by law. Further, Lessor warrants that Lessor is not aware of any existing environmental pollution on or within a reasonable distance of the Leased Premises. Since Lessor is not the fee simple owner of the Property, then this Lease shall not be effective unless and until the fee simple owner of the Property has executed a Consent Agreement to this Special Purpose Lease in a form substantially the same as **Exhibit "C"** attached hereto.

8. USE OF PREMISES

If the use of the Leased Premises for the sale of motor fuel shall be prohibited or enjoined by lawful authority, or if all or any part of the Property is taken in condemnation, or if other circumstances beyond Lessee's control render the Leased Premises unsuitable for the purpose of Lessee, Lessee may, at its option, by giving to Lessor thirty (30) days' notice of its intention to do so, terminate this Lease. Such termination shall also effect termination of the Marketing Agreement.

9. EMINENT DOMAIN

In the event all or any portion of the Leased Premises are taken through condemnation proceedings, then Lessee shall negotiate settlement or shall proceed at law with the condemning authority for a determination of value of and recovery by Lessee of the value of its leasehold and of the value of Motor Fuel Equipment owned by Lessee which is taken in condemnation. In the event only a portion of the Leased Premises are taken through condemnation proceedings and Lessee elects to continue this Lease in effect, Lessee shall relocate its Motor Fuel Equipment and otherwise restore that portion of the Leased Premises remaining to a condition equal to its prior condition and satisfactory to Lessee for the purpose of selling motor fuel.

10. PERMITS AND LICENSES

Lessor shall fully cooperate in procuring in the name of Lessor or Lessee or in the name of Lessee's nominee, all permits, authorization, and licenses required or, in Lessee's opinion, deemed reasonably necessary or desirable for the conduct on said Leased Premises of the business of selling motor fuel.

11. NUISANCE

Lessor covenants and agrees that it will not permit any nuisance to be created, maintained, or carried on upon the Leased Premises or the Property.

12. INSURANCE

Each party hereto shall be responsible for providing hazard insurance respectively, covering their own property.

13. RIGHT TO ASSIGN OR SUBLET

Any assignment by either party shall be made only after the assigning party has obtained the prior written consent of the other party and any assignment made by either party without such written consent shall be invalid.

14. PROHIBITION OF OPERATION

The parties agree that if the operation of remote controlled motor fuel dispensing equipment shall, by any governmental regulations or authority, be prohibited, or necessary permits for such operations be refused, this Lease may, at Lessee's option, be declared by Lessee to be void and of no force and effect, and in the event Lessee shall so decide, then the parties hereto shall be discharged from any and all obligations or liabilities hereunder which arise or accrue thereafter. Lessee shall, within ten (10) days of receipt of such notice of prohibition or refusal, and Lessee's election to so terminate this Lease, notify Lessor thereof in writing, and Lessee shall thereafter have the right to remove all of its Motor Fuel Equipment previously installed on or in the Leased Premises within ninety (90) days of receipt by Lessor of said written notice from Lessee. Lessee may, at its sole option elect to contest such prohibition or refusal, in which event said notice shall be given by Lessee within ten (10) days of the date upon which said prohibition or refusal is made final or the date upon which any right of appeal or rehearing expires.

15. RIGHT OF ACCESS

Lessor hereby also grants and conveys to Lessee the right of access, ingress and egress to and from the Leased Premises at all times during the term of this Lease, which right of access, ingress and egress shall be for the benefit of the Lessee, its transferees, assigns and customers.

16. FIRST RIGHT OF REFUSAL

Lessor hereby grants to Lessee the right of first refusal to purchase or lease the Property, the improvements and the business located on the above-described Property of which the Leased Premises is a portion, should Lessor decide during the term of this Lease or during any renewal or extension hereof, to sell or lease all or any portion of the Property, or if Lessor has a right of first refusal to purchase the Property and declines to do so. Lessor shall give to Lessee written notice of Lessor's decision to sell or lease such Property or any portion thereof specified by Lessor and the terms proposed by Lessor (If Lessor has received a right of first refusal to purchase the Property from its lessor and declines to purchase same, then Lessor shall make sure that Lessee has at least thirty (30) days to exercise its right to purchase the Property). Lessee shall have thirty (30) days after receipt of such notice within which to elect to purchase or lease such Property on the same terms as contained in such notice. No sale or lease by Lessor of the Property, or any portion thereof shall be valid without Lessor having first complied with

this notice requirement and Lessee having declined or failed to exercise its right to purchase or lease within said thirty (30) day period. In the event that Lessee shall fail to exercise its right of first refusal within said thirty (30) day period, then Lessor shall be free to sell or lease the property described in Lessor's notice to Lessee on the same terms contained in the notice or on terms not more favorable to the purchaser or Lessee at any time within six (6) months following the expiration of said thirty (30) day period. If no such sale or lease is consummated by Lessor within said six (6) month period, then this notice procedure shall again be complied with by Lessor if Lessor shall again offer the Property for sale or lease. In the event Lessee shall decline or shall fail to timely exercise its right of first refusal, no sale or lease by Lessor shall adversely affect the rights of Lessee under this Agreement.

**17. DEFINITIONS**

All terms not specifically defined in this Special Purpose Lease shall have the same meaning as defined in the Marketing Agreement.

**18. NOTICES**

All notices, payments, and demands shall be made by mail addressed to the appropriate party at the following addresses:

Lessee: Mansfield Oil Company of Gainesville, Inc.
1025 Airport Parkway, S. W.
Gainesville, GA 30505-0198
Attention: Michael F. Mansfield, Sr.

Lessor: Market Center, Inc.
3601 Sweeten Creek Road
Arden, NC 28704
Attention: Andy Jordan

or at such other address as one party shall give notice to the other by registered mail.

**19. ATTORNEY FEES**

If suit is brought by either party for breach of any provision of this Lease, the losing party agrees to pay all costs incurred by the prevailing party in connection with such suit, including reasonable attorney fees.

**20. SEVERABILITY**

If any provision of this Lease or the application hereof shall be held unenforceable as contrary to any valid law or regulation, such provision shall be deemed to be severable and stricken from this Lease so as to conform the Lease to existing law or regulation for so long as such law or regulations remain effective. Such invalidity shall not affect other provisions of this Lease.

**21. SUCCESSORS AND ASSIGNS**

The covenants and provisions hereto shall extend to and be binding upon the parties hereto, their respective heirs, executors, administrators, successors and assigns, no assignment shall be binding unless such assignment has been consented to by Lessee in writing.

**22. WAIVER**

No waiver by Lessor or Lessee of any default of the other under this Lease shall operate as a waiver of any future default whether of a like or different character.

**23. ENTIRE AGREEMENT**

This Lease and the Marketing Agreement of even date herewith between the parties hereto, constitutes the entire agreement between the parties and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect.

**24. GOVERNING LAW**

This Lease shall be governed by the substantive laws of the State of Georgia, without reference to its conflicts of law provisions.

**25. JURISDICTION**

All disputes shall be resolved in Hall County, Georgia, and Lessor hereby submits to the jurisdiction of the courts of Hall County, Georgia and hereby agrees that venue is proper in Hall County, Georgia.

**26. SPECIAL STIPULATIONS**

Any special stipulations with respect to this Lease are attached hereto as **Exhibit "D"**. In the event of any conflict between the provisions of the Lease and the special stipulations set forth on **Exhibit "D"**, the special stipulations shall prevail.

**IN WITNESS WHEREOF**, this Lease is executed in duplicate originals on the date set forth below.

Signed, sealed and delivered as to Mansfield in the presence of:

[signature]
Witness

[signature]
Notary Public
My Commission Expires:
(AFFIX NOTARIAL SEAL)

LESSEE:
**MANSFIELD OIL COMPANY OF GAINESVILLE, INC.**

By: [signature]
Name:
Title:
Date: 8/24/05
(CORPORATE SEAL AFFIXED)

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

Signed, sealed and delivered as to Lessor in the presence of:

Witness

Notary Public

My Commission Expires: 11-08-05

(AFFIX NOTARIAL SEAL)

NOTARY PUBLIC
HENDERSON COUNTY, NC
My Commission Expires November 8, 2005

LESSOR:
**Market Center, Inc.**

By:
Name: Andy Jordan
Title: VP / Sec
Date: 2-25-05

(CORPORATE SEAL AFFIXED)

The Lessor's obligations pursuant to the above and foregoing Special Purpose Lease are personally guaranteed by the undersigned Guarantor, as an individual.

Signed, sealed and delivered as to Lessor in the presence of:

Witness

Notary Public

My Commission Expires: 11-08-05

(AFFIX NOTARIAL SEAL)

JANICE THOMAS
NOTARY PUBLIC
HENDERSON COUNTY, NC
My Commission Expires November 8, 2005

**GUARANTOR:**

By:

Name: Andy Jordan

Date: 2-25-05

**EXHIBIT A**
**TO**
**SPECIAL PURPOSE LEASE**

DESCRIPTION OF THE PREMISES

## LEGAL DESCRIPTION
## (PARCEL 1 & 2)

BEGINNING AT AN IRON PIN (P.O.B.) ON THE NORTHERN RIGHT-OF-WAY OF U.S. HIGHWAY NO. 129, WHICH IRON PIN IS ±587 FEET FROM SWEETWATER ROAD, THENCE WITH THE NORTHERN RIGHT-OF-WAY OF U.S. HIGHWAY NO. 129 THE FOLLOWING TWO COURSES AND DISTANCES: WITH A CURVE WHOSE RADIUS IS 2,261.11 FEET A CHORD OF N44-41-59W 86.07 FEET TO AN IRON PIN, THENCE N46-03-18W 120.15 FEET TO A NAIL, THENCE LEAVING THE NORTHERN RIGHT-OF-WAY OF U.S. HIGHWAY NO. 29 AND WITH THE PROPERTY NOW OR FORMERLY PHILLIPS REAL ESTATE, LLC THE FOLLOWING TWO COURSES AND DISTANCES: N43-13-11E 305.06 FEET TO A NAIL, THENCE S46-46-49E 214.04 FEET TO AN IRON PIN, THENCE WITH A NEW LINE ACROSS THE PROPERTY NOW OR FORMERLY UNITED COMMUNITY BANK THE FOLLOWING THREE COURSES AND DISTANCES: S46-46-49E 29.96 FEET TO AN IRON PIN, THENCE S43-13-11W 178.33 FEET TO AN IRON PIN, THENCE S59-48-41W 34.20 FEET TO AN IRON PIN, THENCE WITH THE PROPERTY NOW OR FORMERLY CHEROKEE REALTY & CONSTRUCTION THE FOLLOWING TWO COURSES AND DISTANCES: N42-58-00W 37.54 FEET TO AN OLD IRON PIN, THENCE S37-55-24W 101.53 FEET TO THE POINT OF BEGINNING CONTAINING 1.62 ACRES OR 70,555 SQUARE FEET.

L/C: 032-1311

**EXHIBIT B**
**TO**
**SPECIAL PURPOSE LEASE**

LIST OF MOTOR FUEL EQUIPMENT OWNED BY LESSEE LOCATED ON THE PROPERTY

**[NOT TO BE COMPLETED AND SIGNED UNTIL AFTER INSTALLATION.]**

LESSOR:
Market Center, Inc.

By:______________

Name: Andy Jurob

Title: VP / Sec

Date: 2-25-05

LESSEE:

Mansfield Oil Company of Gainesville, Inc.

By:______________

Name: JOHN BOYD

Title: Sr VP

Date: 8/24/05

**EXHIBIT "A"**
**Petroleum Equipment List**

**Open Date:** 9/23/2005
**Brand:** Solo

**Location: ROBBINSVILLE SOLO**
**RMA #:** 759

**Date Prepared:** 1/12/2006.
**Preparer:** Michelle Martin.

**I. Gasoline Canopy: 80 X 30 X 4**

4 Columns
16 Canopy Lights (Brand Scottsdale)
Imaging to Refiner Specifications:

- 220' Striping or Canopy ID
- 7 Brand Logos or Letters
- _____ Other Brand ID: _____.
- 5 Windshield Washer Stations

**II. Diesel Canopy: _____ X _____ X _____** Check if N/A: ☒

_____ Columns
_____ Canopy Lights (Brand _____)
Imaging to Refine Specifications:

- _____' Striping or Canopy ID
- _____ Brand Logos or Letters
- _____ Other Brand ID: _____.

**III. Intercom (Gasoline Canopy):**

Qty:1 Model: TSC 1008 MV 8 Station w/MTC Brand: Esco.
Speakers:_____ (Model#_____) Speakers are in the dispensers

**Intercom (Diesel Canopy):**

Qty: 1 Model: SPK 1013 Brand: Esco.
Speakers:_____ (Model#_____)

**IV. Underground Storage Tanks:**

Qty: 1 S/N:UL #P-247551 Diameter: 96" Gallon: 12,000 Manufacturer: Modern Welding
S/W or D/W: D/W Glasteel II.
Qty: 1 S/N:UL #P-247552 Diameter: 96" Gallon: 12,000 Manufacturer: Modern Welding
S/W or D/W: D/W Glasteel II.
Qty: 1 S/N:UL #P-247553 Diameter: 96" Gallon: 10,000 Manufacturer: Modern Welding
S/W or D/W: D/W Glasteel II.
Qty: _____ S/N:_____ Diameter: _____ Gallon: _____ Manufacturer: _____
S/W or D/W: _____.

- All tanks installed with complete tank, line & leak detector testing.

**Petroleum Installation (labor & accessories):**

- Labor for above petroleum installation with concrete tank & canopy pad.
- Accessories: APT piping package, tank fittings, manholes, submersible pumps, Stage II vapor recovery piping, sumps, vent lines, leak detection equipment, electrical, concrete, hoses, nozzles, breakaways & splash guards.

**Submersible Pump Package:**

Qty: 3 Brand: FE Petro Model: _____ Size: 1 1/2 h.p. Sub-Pump.

Qty: _____ Brand: _____ Model: _____ Size: _____.

**Leak Detectors:**
Qty: 3 Brand: FE Petro Model: Mech Leak Detector.
Qty: _____ Brand: _____ Model: _____.

V. **Dispensers – Manufacturer: WAPU Ovation.**
Qty:4 Model: B12/3 Crinds? (Y/N) Y/4 S/N: 78928A; 78929A; 78930A; 78931A
Qty:1 Model: 3/G2227D/M Crinds? (Y/N) N S/N: 79036A.
Qty:1 Model: 3/G2007/LR Crinds? (Y/N) N S/N: 79035A.
Qty:_____ Model: _____ Crinds? (Y/N) _____ S/N: _____;_____;_____.
Qty:_____ Model: _____ Crinds? (Y/N) _____ S/N: _____;_____;_____.

- All imaged to refiner specifications.

VI. **Gasoline Console or Integrated POS Equipment:**
Model:120 Key Brand:Ruby Verifone
Includes: 2 Customer Display(s); 1 Modem; 1 Satellite Register; 2 Receipt Printer(s); 1 Back Office Printer _____; Other Items: D/W Hyper PIB Kit.

VII. **Signs:**

- See attached photo.

VIII. **Fascia Lights:**
_____ Single Assembly Installations (fixture, louver, lamp & pole)
_____ Dual Assembly Installation (fixtures, louvers, lamps & pole)
_____ Other Spec: _____.

IX. **Automatic Tank Gauge (ATG) System:**
Brand: TLS Model #: 350.
# of Gauges: 3.
Printer: 1.
Modem: 1.
Fax Modem: _____.
Other: _____.

X. **OTHER:**
**4 Trash Cans**
**1 Power Box MNF00716031, 3 Phase**
**4 Fire Extinguishers - New 10 lb. ABC Amerex**
**1 Light Pole @ LSD Island.**

**EXHIBIT C**
**TO**
**SPECIAL PURPOSE LEASE**

CONSENT AGREEMENT TO SPECIAL PURPOSE LEASE

May 6, 2009

Michael F. Mansfield, Pres.
Mansfield Oil Company of Gainsville, Inc.
1025 Airport Parkway SW
Gainsville, GA 30501

Re: *That certain Mansfield Retail Marketing Agreement by and between Mansfield Oil Company of Gainsville, Inc. and WNC Solo, Inc., formerly known as Market Center, Inc dated 24 August, 2005*

Dear Mr. Mansfield:

This letter declares Mansfield Oil Company of Gainsville, Inc. ("Mansfield") in default under paragraph 27(e) of the referenced agreement. The events of default include the following:

1. It appears WNC Solo, Inc. ("WNC Solo") is being overcharged on freight in the amount of the difference between what United Petroleum Company is charging Mansfield and what WNC Solo is being charged.

2. Mansfield continued the ethanol blend from mid-October of 2008 through late January of 2009 even though it was increasing our cost. It only stopped after we asked it to do so and corrected Mansfield's computations

3. Your accounting practices are inaccurate with respect to swelling and contraction of fuel, which also affects beginning and ending inventory.

4. We do not believe that Mansfield has passed through discounts on fuel to us.

5. Mansfield's supply agreements with our competitors in the Robbinsville market are injuring our business and violate paragraph 8 of the Retail Marketing Agreement ("RMA"), the best efforts clause. This practice by Mansfield has affected our pricing and position with respect to our competitors while Mansfield still makes its sales. It has also undermined our 145,000 gallon per month special stipulation provision, making it



Exhibit "C"

almost impossible for us to reach that level. Moreover, since Mansfield took over pricing and matched us with Texaco and Chevron, we have been experiencing double digit percentage losses on gallons sold in 2009 versus 2008.

6. Mansfield, intentionally or negligently, misquoted our cost by an average of $.07 per gallon under the actual cost in December of 2008 and January 2009 undermining our ability to make money on motor fuel.

7. Mansfield violated the Retail Marketing Agreement in January when prices were cut to the point of selling at a loss, which we believe may violate unfair competition laws.

8. Mansfield has consistently refused to verify costs in breach of our business relationship and to provide information showing that it is in compliance with Generally Accepted Accounting Principles.

9. We believe that Mansfield is getting volume discounts through credit card transactions which decrease its own costs, but which it does not split with us.

10. As a result of the foregoing, we believe we are not receiving the proper profit splits.

11. Service-related defaults include: (a) The high rise sign at Robbinsville, which has been in a condition involving burned out lights for months and was partially repaired, but never completely repaired, despite repeated notices by us; and (b) The jobbers are not maintaining the appearance of the facility, though the industry standards are for that to be done at least once a year. They have not touched up paint or like work at any point in time during the length of the contract between these parties.

12. All of the above are also violations of the best efforts clause.

We hereby declare Mansfield to be in default of the Retail Marketing Agreement. It is required within ten (10) days to cure all aspects of this default, including to provide proper accounting and payment to us of our fair share. It is required to cease making our business model impossible because of its pricing and unfair competition practices. The RMA has been in default for a long time. We are just now discovering some of these events. Unless all of these items are cured within ten (10) days, and we are paid fair compensation for violating the above paragraphs, we will deem the Retail Marketing

Agreement to be in complete, total, material and un-curable default, dating to its inception, and further discharging us from any obligations to Mansfield.

Sincerely,

Andy P. Jordan
President, WNC Solo, Inc.

MANSFIELD

Mansfield Oil Company
1025 Airport Parkway, S.W.
Gainesville, Georgia 30501

(678) 450-2000
FAX (678) 450-2200

May 15, 2009

Via FIRST CLASS U.S. MAIL
Via E- MAIL

Attn: Andy P. Jordan
WNC Solo, Inc.
P. O. Box 1787
Robbinsville, NC 28771

Attn: Andy P. Jordan
WNC Stores, LLC
P. O. Box 1787
Robbinsville, NC 28771

Re: Wrongful Termination of Retail Marketing Agreements

Dear Andy:

The undersigned represents Mansfield Oil Company with respect to that certain Mansfield Retail Marketing Agreement by and between Mansfield Oil Company of Gainesville, Inc. (hereinafter referred to as "Mansfield") and Larry Reynolds dated July 1997 as assigned to WNC Stores, LLC (hereinafter referred to as the "Robbinsville RMA") and that certain Mansfield Retail Marketing Agreement by and between Mansfield and WNC Solo, Inc. (formerly known as Market Center, Inc.) dated August 24, 2005 (hereinafter referred to as the "Andrews RMA"). The purpose of this letter is to respond to your letters of default regarding the Robbinsville RMA and Andrews RMA dated May 6, 2009.

Please be advised that the allegations set forth in your May 6th letters do not constitute "events of default" under the agreements. Mansfield strongly disputes the factual basis of the allegations contained therein and in fact many of the alleged "events of default" are not even obligations of Mansfield or part of the agreement whatsoever. It appears that you are attempting to wrongfully terminate these agreements by creating defaults that do not exist. Consequently, a termination of the agreements based on the allegations contained in your letters would be improper. Any specific equipment maintenance issues that are the responsibility of Mansfield will be addressed in a timely manner.

You are hereby notified that if you terminate either agreement based on the reasons set forth in your May 6th letters you will be in breach and Mansfield will vigorously pursue any remedies available under the law and the agreements, including, without limitation, seeking attorney's fees and expenses of litigation. Further, please be aware that according to the terms of

Exhibit "D"

the Andrews RMA, if the RMA relationship is terminated for any reason, then, in addition to any other rights or remedies Mansfield may have, Mansfield may require the Marketer to purchase the equipment provided by Mansfield at an estimated cost of **$280,000.00**.

Mansfield hopes that this matter may be resolved without the need for instituting litigation. However, Mansfield is prepared to prosecute its' rights under the agreements to the fullest extent of the law.

If you have any questions please do not hesitate to contact me.

Sincerely,

Matthew R. Girardot

Matthew R. Girardot, Esq.
Associate Counsel

MRG/lsf

cc: Ed Bleynat, Esq.
Brad Puryear, Esq.
Rick Cosmer
Joe Campbell

May 21, 2009

*Via Facsimile and First Class Mail*

Michael F. Mansfield, Pres.
~~Mansfield Oil Company of Gainsville, Inc.~~
1025 Airport Parkway SW
Gainsville, GA 30501

Re: *That certain Mansfield Retail Marketing Agreement by and between Mansfield Oil Company of Gainsville, Inc. and WNC Solo, Inc., formerly known as Market Center, Inc dated 24 August, 2005*

Dear Mr. Mansfield:

This letter serves to terminate the referenced Retail Marketing Agreement ("RMA"). You have long been in receipt of our 6 May 2009 letter declaring Mansfield Oil Company of Gainsville, Inc. ("Mansfield") to be in default under paragraph 27(e) of the referenced agreements as assigned. The defaults addressed in my earlier letter remain uncured. In addition, we continue to learn about additional breaches of duty by Mansfield to us. The RMA is declared to be null and void based upon the fraudulent inducements ~~by Mansfield from the outset of the agreement to date. Therefore, WNC Solo, Inc. hereby~~ terminates the RMA for failure to cure stated defaults, and declares the RMA to be null and void.

If Mansfield or its representatives seek to enter the Robbinsville property without my express written consent, it will be treated as a civil and criminal trespass.

Sincerely,

[signature]

Andy P. Jordan
President of WNC Solo, Inc.

Exhibit "E"

TO: MANSFIELD OIL COMPANY OF GAINESVILLE, INC.
1025 AIRPORT PARKWAY, S.W.
GAINESVILLE, GEORGIA 30505-0198

THIS GUARANTY made this ___ day of _____________, 2004, by Andy P. Jordan of 3601 Sweeten Creek Road, Arden, NC 28704 (hereinafter referred to as "Guarantor") to MANSFIELD OIL COMPANY OF GAINESVILLE, INC., of 1025 Airport Parkway, S.W., Gainesville, Hall County, Georgia 30501 (herein referred to as "Creditor") with respect to credit and/or other financial accommodations extended and to be extended to Market Center, Inc., 3601 Sweeten Creek Road, Arden, NC 28704, and/or any of its successors or assigns (herein referred to as "Debtor");

**WHEREAS**, Debtor is desirous of obtaining credit and/or other financial accommodations from Creditor for the purchase of petroleum products and/or other goods (herein "Goods") and/or services as well as for any other obligations that may arise from Debtor to Creditor, including, but not limited to, those obligations set forth in, or referenced in, any fuel supply, fuel marketing and /or fuel services agreement between the Debtor and Creditor, a copy of which, if applicable, may be attached as an Exhibit hereto; and,

**WHEREAS**, Creditor requires security for payment of any and all indebtedness currently and/or in the future owed by Debtor to Creditor including, but not limited to, the purchase of Goods, any obligation in any fuel supply or fuel marketing agreement, or any other indebtedness or obligation owed by Debtor to Creditor; and,

**WHEREAS**, Guarantor is interested in Debtor and the extension of credit to, or the making of other financial accommodations to, Debtor by Creditor will benefit Guarantor, and;

**WHEREAS**, Guarantor is willing to furnish such security in the form of a guarantee of payment of the current and all future indebtedness of Debtor;

**NOW THEREFORE**, in consideration of the payment of the sum of Ten ($ 10.00) Dollars by Creditor to Guarantor, receipt of which is hereby acknowledged, and in further consideration of the extension of credit, or provision of other financial accommodation made by Creditor to Debtor whether current or in the future and the benefits thereof to accrue to Guarantor, Guarantor agrees as follows:

1. **Definitions.**
   A. "Indebtedness" is used in its most comprehensive sense and means and includes any and all of Debtor's liabilities, obligations and debts to Creditor, now existing or hereinafter incurred or created, including, without limitation, all credit, advances, interest, costs, debts, financial accommodations, other obligations and liabilities of Debtor; whether any such indebtedness is voluntarily or involuntarily incurred, due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined.
   B. "Financial Accommodations" means and includes any and all of Debtor's liabilities, obligations and debts to Creditor, now existing or hereinafter incurred or created including, without limitation, all credit, advances, interest, costs, debts and other obligations and liabilities of Debtor. Financial Accommodations also includes but is not limited to payment by Creditor to Debtor of allowances, credits or rebates (collectively "Allowances") which Allowances, if applicable, shall be paid to Debtor upon terms set forth by Creditor and which Allowances are contingent upon Debtor's complying with certain conditions as set forth in an applicable fuel supply agreement between Debtor and Creditor.

2. **Statement of Guaranty.** Guarantor hereby unconditionally guarantees to Creditor, without which guaranty Creditor would not extend credit to Debtor, that Debtor shall fully and promptly perform, pay and discharge all of its currently existing and future indebtedness to Creditor arising for any reason whatsoever. Guarantor acknowledges that the consideration of credit extended to, or other financial accommodations made to, Debtor is determined by Creditor in its sole discretion from time to time. Guarantor hereby guarantees absolutely and unconditionally to Creditor the due and prompt payment of any existing or future indebtedness pursuant hereto of Debtor to Creditor in accordance with the terms hereof. Guarantor hereby agrees that if Debtor defaults in the payment of any such indebtedness according to its terms, Guarantor will pay such indebtedness in full to Creditor or its order. Guarantor also hereby agrees to pay to Creditor or its order on demand reasonable attorney's fees and all costs and other expenses incurred by Creditor in collecting or composing any indebtedness of Debtor guaranteed hereunder by Guarantor or in enforcing this guaranty against Guarantor.

   This Guaranty shall not obligate Creditor to extend to Debtor any amount of credit, or to provide any additional financial accommodations, but such extensions or provisions and the terms thereof shall be in the sole and absolute discretion of Creditor.

3. **Scope and Duration.** This is a continuing guaranty. Notice of acceptance is waived by Guarantor. It shall remain in full force until Guarantor delivers to the Creditor written notice revoking it as to indebtedness incurred subsequent to such delivery. Such revocation shall not affect the Guarantor's obligations hereunder with respect to the guarantee of payment of all indebtedness that is incurred prior to the date of receipt of said notice by Creditor.

Exhibit "J-1"

4. **Creditor Rights and Waiver by Guarantor.** Without further authorization from or notice to Guarantor, Creditor may grant credit to Debtor from time to time. With or without notice to Guarantor, Creditor may alter, compromise, accelerate, extend or change the time or manner of payment of any indebtedness, increase or reduce the rate of interest thereon, or add or release any one or more other guarantors for said indebtedness and add, release or otherwise discharge any other security. No exercise or non-exercise by Creditor of any right hereby given to it, no dealing by Creditor with Debtor or any other guarantor and no change, impairment, or suspension of any right or remedy of Creditor shall in any way affect any of Guarantor's obligations hereunder or give any recourse against Creditor. Guarantor further agrees that all liabilities of Debtor shall mature immediately upon insolvency of Debtor or the filing by or against Debtor of any insolvency proceedings, or the calling of a meeting of the Debtor's creditors.

   If legal action is taken to enforce this guaranty or any provision hereof, such action may be maintained alone, or joined with any action or other proceeding against Debtor or any other guarantor of Debtor's obligations to Creditor. Prior action or suit against Debtor, whether alone or jointly with other guarantors, shall not be a prerequisite to Creditor's right to proceed hereunder in case of Debtor's default. The rights of Creditor are cumulative and shall not be exhausted by its exercise of any of its rights hereunder or otherwise against Guarantor by any number of successive actions until and unless all indebtedness hereby guaranteed has been paid.

5. **Application of Payment.** With or without notice to Guarantor, Creditor in its sole discretion may apply all payments from Debtor, from Guarantor or from any other guarantor under this or any other instrument or realized from any security in such manner or order of priority as Creditor sees fit, to any obligation of Debtor, whether or not such obligation is due at the time of such application.

6. **Subrogation.** Until all indebtedness, the payment of which is hereby guaranteed, has been paid in full, Guarantor shall not have any right of subrogation unless expressly granted in writing by Creditor.

7. **Subordination of Other Indebtedness of Guarantor.** All existing or future indebtedness of Debtor to Guarantor is hereby subordinated to all indebtedness the payment of which is hereby guaranteed. Without the prior written consent of Creditor, no such indebtedness shall be paid in whole or in part as long as there exists any outstanding indebtedness the payment of which is guaranteed hereby.

8. **Severability.** Should any one or more provisions of this guaranty be determined to be illegal or unenforceable by a court of competent jurisdiction, all other provisions shall remain effective.

9. **Binding Effect.** This guaranty shall bind Guarantor, his heirs, executors, administrators, successors and assigns and shall inure to Creditor's successors and assigns. All of Creditor's rights are cumulative and not alternative.

10. **Effective.** This guaranty shall be effective when accepted and shall apply, as stated above, to any currently existing and future indebtedness owed by Debtor to Creditor for any reason whatsoever, the due and prompt payment of all of which is guaranteed hereby.

IN WITNESS WHEREOF, Guarantor has executed this Guaranty the day and year first above written.

GUARANTOR – Andy P. Jordan

Andy P Jordan

Print Name

[signature]

Signature

PO Box 1970

Address Skyland, NC 28776

Lindsay E. Paulson

Witness

[signature]

Notary Public

My Commission Expires: 4/17/2005

Accepted this ________ day of ______________________, ________.

Mansfield Oil Company of Gainesville, Inc.

By: [signature]

Title: CREDIT MGR

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| WNC STORES, LLC, WNC SOLO, INC., formerly known as Market Center, Inc., and WHITE'S SOLO, LLC,<br><br>Plaintiffs,<br><br>Vs.<br><br>MANSFIELD OIL COMPANY OF GAINESVILLE, INC.,<br><br>Defendant. | ) | Civil No. 2:09CV33 |
| MANSFIELD OIL COMPANY of GAINESVILLE, INC.<br><br>Plaintiff,<br><br>Vs.<br><br>ANDY P. JORDAN; DEBORAH DUPUIS; WNC STORES, LLC; and WNC SOLO, INC.,<br><br>Defendants. | ) | Civil No. 1:09cv205 |

PRELIMINARY INJUNCTION

For the reasons stated in the Memorandum and Order filed herewith,

**IT IS, THEREFORE, ORDERED that**, from the entry of this Preliminary Injunction and until the issues herein have been resolved, the Court directs as follows:

1. Mansfield is enjoined from interfering with the delivery of fuel and other items to Jordan Entities' facilities;

2. Mansfield is enjoined from having any further communications with suppliers or vendors of Jordan Entities, stating or suggesting they are in legal jeopardy if they deliver fuel or other supplies to Jordan Entities' businesses based upon title to the equipment, the application of DENR standards or regulations, or otherwise;

3. Mansfield is enjoined from stating or suggesting that the suppliers or trucking companies might or will be reported to DENR for delivering product to Jordan Entities;

4. Mansfield is enjoined from making any reports to DENR regarding any alleged leakage, or improper use of the tanks or other equipment, unless it has actual, specific evidence that such a leak has occurred, in which event Mansfield shall also simultaneously provide counsel for Jordan Entities with notice and copies of any such proposed communications;

5. Mansfield is enjoined from interfering with renewal or reissuance of permits on underground storage tanks Jordan Entities is using, and from having any communications with others tending to interfere with the rights of Jordan Entities; and

6. Mansfield is further enjoined from taking any actions inconsistent with Jordan Entities' peaceful possession of the equipment that is a subject of these motions during the pendency of litigation.

**IT IS FURTHER ORDERED that:**

7. Jordan Entities shall pay to Mansfield the sum of **ONE THOUSAND, TWO HUNDRED DOLLARS ($1,200.00)** per month as rental for use of the Mansfield tanks and equipment during the ongoing litigation. The first payment shall be due on or before **SEPTEMBER 1, 2009,** and a like amount shall be due on or before the first day of each month thereafter until this action is concluded or the amount due is amended by further order of the Court; and

8. Jordan Entities shall maintain an insurance policy adequate in amount to cover damages resulting from tank leakage from the Mansfield tanks located on Jordan Entities' properties; and

9. Jordan Entities shall maintain in good condition all Mansfield property being used in the operation of its franchise businesses.

**ENTERED** this the 18th day of August, 2009, at 11:45 a.m.

Signed: August 18, 2009

Lacy H. Thornburg
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

WNC STORES, LLC, WNC SOLO, INC., formerly known as Market Center, Inc., and WHITE'S SOLO, LLC,

Plaintiffs,

Vs.

MANSFIELD OIL COMPANY OF GAINESVILLE, INC.,

Defendant.

Civil No. 2:09CV33

---

MANSFIELD OIL COMPANY of GAINESVILLE, INC.

Plaintiff,

Vs.

ANDY P. JORDAN; DEBORAH DUPUIS; WNC STORES, LLC; and WNC SOLO, INC.,

Defendants.

Civil No. 1:09cv205

---

## MEMORANDUM AND ORDER

**THESE MATTERS** came on for hearing on July 28, 2009, before the undersigned on the motion for preliminary injunction filed by WNC Stores,

LLC, WNC SOLO, Inc., formerly known as Market Center, Inc., and White's SOLO, LLC, in Civil Action No. 2:09-cv-33, and the motion for claim and delivery filed by Mansfield Oil Company of Gainesville, Inc., in Civil Action No. 1:09-cv-205.

The Court, having considered the matters of record and heard the arguments of counsel, finds that a preliminary injunction for WNC Stores, LLC, *et al.*, is warranted and the motion of Mansfield Oil Company for claim and delivery be denied.

## I. FINDINGS OF FACT

The Court has considered the verified pleadings, motions, affidavits, and documents presented by the parties. In reviewing these filings, the Court is mindful that the presentation of evidence at this stage of the proceedings relates principally to the parties' motions seeking equitable or interim relief. Consequently, the Court makes its findings without prejudice to the parties' rights for the jury to determine the ultimate issues in this case, following the presentation of evidence at trial.

The underlying facts have given rise to four currently-pending lawsuits; the two matters herein along with two additional lawsuits filed in

Georgia.[1] Mansfield Oil Company of Gainesville, Inc., filed Civil No. 1:09CV205 on May 29, 2009; the same day, WNC Stores, LLC, WNC SOLO, Inc., formerly known as Market Center, Inc., and White's SOLO, LLC, (hereinafter "the Jordan Entities") filed an action in the Superior Court of Graham County, North Carolina, which Mansfield removed to this Court on June 4, 2009, and was filed as Civil No. 2:09CV33.

WNC Stores, LLC, operates a convenience store located in Cherokee County, North Carolina, known as "Andrews SOLO." White's SOLO, LLC, formerly operated a convenience located in Cherokee County, North Carolina, known as "White's SOLO." WNC SOLO, Inc., operates a convenience store in Graham County, North Carolina, known as "Robbinsville SOLO." WNC Stores, LLC, WNC SOLO, Inc., and White's SOLO, LLC, are all owned and controlled by Andy Patton Jordan and Deborah Dupuis. For each of these three locations, the parties entered into a set of contractual agreements including documents entitled "Retail

---

[1] *Mansfield Oil Company of Gainesville, Inc. v. WNC SOLO, Inc. f/k/a Market Center, Inc. and Andy Patton Jordan,* United States District Court, Northern District of Georgia, Gainesville Division, File No. 2:09-cv-00108-WCO and *Mansfield Oil Company of Gainesville, Inc. v. White's SOLO, LLC and Andy Patton Jordan,* Superior Court of Hall County, Georgia, File No. 2009SV1186 D.

Marketing Agreement" ("RMA") and "Special Purpose Lease" (SPL). Although the terms of these agreements vary somewhat from location to location, for purposes of this Order, the material terms are the same.

Pursuant to the pertinent terms of the SPLs, the Jordan Entities leased to Mansfield an interest in its real property and the parties then placed Mansfield's tanks and equipment on the property for use in the retail distribution of motor fuel to consumers. In the SPLs, the parties further agreed that the equipment at all times remains Mansfield's personal property. In the companion RMAs, the parties agreed Mansfield would retain ownership of all motor fuel and petroleum products placed into Mansfield's equipment until the fuel is sold to retail customers. The parties agreed that upon termination of the agreements, Mansfield may retrieve the equipment installed and used in the business operations.

For a period of over a year, the parties have negotiated their disputes at all three locations. On May 22, 2009, the Jordan Entities terminated the agreements with Mansfield and prohibited Mansfield from accessing its equipment until these disputes between the parties have been adjudicated. From that time, Jordan Entities has retained the profits from the sale of motor fuel obtained from sources other than Mansfield at the two operating

premises, and has prevented Mansfield from retrieving its property by reason of a variety of alleged breaches of contractual obligations. Jordan Entities also contends immediate removal of the equipment would destroy its businesses. Thereafter, as set forth above, these lawsuits ensued, Mansfield seeking, among other things, the return of its equipment at the Andrews SOLO location, and the Jordan Entities seeking injunctive relief prohibiting Mansfield from doing so. [2]

## II. CONCLUSIONS OF LAW

Jordan Entities has moved for injunctive relief pursuant to the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* ("PMPA"), and the provisions of Fed. R. Civ. P. 65.

The Court finds that Jordan Entities is a "'franchisee' [meaning] a retailer or distributor (as the case may be) who is authorized or permitted, under a franchise, to use a trademark in connection with the sale,

---

[2] Mansfield has not filed an action seeking the return of its property at the White's SOLO and Robbinsville SOLO locations. Instead, Mansfield has filed suit in Hall County, Georgia, pursuant to forum selection clauses in those two contracts, and has moved to dismiss and/or transfer Civil No. 2:09CV33 filed in this Court's Bryson City Division to the United States District Court for the Northern District of Georgia.

consignment or distribution, of motor fuel." **15 U.S.C. § 2801(4).** In this case, use of the SOLO image is controlled by the Mansfield RMA. ***See* Exhibit D, "Special Stipulations," ¶ *1, attached to* Mansfield RMA, and *attached as* Exhibit A-1 to Affidavit of Richard Comer, filed July 23, 2009 in Civil No. 2:09CV33.**

The Court further finds that Mansfield Oil Company of Gainesville, Inc., is a "'franchisor' [meaning] a refiner or distributor (as the case may be) who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel." **15 U.S.C. § 2801(3).**

Title I of the PMPA regulates the relationships between franchisors and franchisees in the gasoline industry. The PMPA was enacted to establish "protection for franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." **S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 874 [cited as Senate Report].** When enacting the PMPA, Congress recognized the inherent disparity "of bargaining power which exists between the franchisor and the franchisee," and the resulting misfortunes of the franchisee. ***Id.* at 876.** In other words, Congress was concerned

with the coercive relationship between the franchisor and the franchisee and adopted the PMPA to protect the franchisee from arbitrary and discriminatory acts of franchisors. Congress also recognized "the legitimate needs of a franchisor to be able to terminate . . . or not renew a franchise relationship based upon certain actions of the franchisee, including certain failures to comply with contractual obligations or upon certain changes in circumstances." **S.Rep. No. 731, 95th Cong., 2d Sess. 19, *reprinted in* 1978 U.S.Code Cong. & Ad.News 873, 877.** The Act must be given a liberal construction consistent with its overriding purpose to protect franchisees. ***Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1221 (7th Cir. 1982).**

While Mansfield disputes the proposition that the PMPA applies to this case, Jordan Entities has nonetheless established that there are serious questions under the PMPA, the provisions of which are invoked in the Jordan Entities' Amended Complaint. ***See* Amended Complaint, filed June 17, 2009, in Civil No. 2:09CV33, at 18-21.** Mansfield, as a franchisor of motor fuel which, under the RMAs, authorized or permitted the franchisee Jordan Entities as retailer to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark (to wit, the

"SOLO" trademark) which was owned or controlled by Mansfield or others permitting such use. The RMAs by and between Mansfield and the Jordan Entities are contracts pursuant to the PMPA in that they are:

(a) contracts under which Jordan Entities operates and markets Mansfield's goods which are subject to leases and other agreements in connection with the sale, consignment, or distribution of motor fuels under the SOLO trademark as described herein; and/or

(b) contracts pertaining to the supply of motor fuel which is to be sold, consigned, or distributed under the SOLO trademark which Mansfield authorizes or permits Jordan Entities to use;

Franchise relationships exist between Mansfield, on the one hand, and Jordan Entities, on the other, in that their agreements involve motor fuel marketing, distribution, and other obligations and responsibilities with respect to the sale, consignment, or distribution of motor fuel. Mansfield, therefore, acts as a franchisor, and Jordan Entities as franchisee, under the Act.

Mansfield, in its relationship with Jordan Entities, purchases motor fuel for sale, consignment, or distribution to Jordan Entities and Jordan Entities makes motor fuel available to the general public for ultimate consumption. Jordan Entities maintains marketing premises using the SOLO trademark or service mark and Mansfield provides motor fuel to

Jordan Entities in interstate commerce. The relationship between the parties is such that Mansfield has stood in a fiduciary capacity to Jordan Entities. Jordan Entities possessed entrepreneurial responsibility in its convenience store facilities for selling product provided by Mansfield to the general public.

Jordan Entities has raised questions about Mansfield engaging in multiple breaches of contract, including setting prices wrongly, engaging in oppressive and inaccurate financial and accounting practices, failing to cure its bad business practices despite repeated demands by Jordan Entities over a period of years, and violating the best efforts clause of the RMAs. Consequently, Jordan Entities maintains it has made a *prima facie* showing that Mansfield has forced a constructive termination of the parties' relationship under the PMPA, and has subjected Jordan Entities to discriminatory treatment by not honoring the pricing provisions that are essential to selling unbranded fuel, instead allowing its other customers, who were competitors of Jordan Entities, price advantages detrimental to Jordan Entities.

PMPA sets forth various grounds and accompanying notice requirements for termination and non-renewal. However, because this

case arises out of constructive termination rather than formal termination, the bases for Jordan Entities' claims include Mansfield's alleged violation of the RMAs, to the extent that they are enforceable. Because the parties are before the Court on a motion for preliminary injunction, the final determination of all these issues is not needed, but only inquiry into whether serious questions exist on the merits.

In deciding whether to issue a preliminary injunction under the PMPA, the Court considers whether there was a termination of the franchise, whether there exists sufficiently serious questions on the merits, and the balance of the hardships. **15 U.S.C. § 2805(b).** Further, the Court should grant a preliminary injunction if:

> (A) the franchisee shows –
> (i) the franchise of which he is a party has been terminated[3] or the franchise relationship of which he is a party has not been renewed, and
> (ii) there exists sufficiently serious questions going to the merits to make such questions a fair ground for litigation; and
> (B) the court determines that, on balance, the hardships imposed upon the franchisor by the issuance of such preliminary injunctive relief will be less than the hardship which

---

[3] While there has been no formal termination, the Court concludes that a constructive termination has occurred if, as alleged by Jordan Entities, the described wrongful acts of Mansfield are found by a jury or admitted by Mansfield to be true.

> would be imposed upon such franchisee if such preliminary injunctive relief were not granted.

**15 U.S.C. § 2805(b)(2)(A) & (B) (footnote added).** Under the foregoing legal standards, Jordan Entities is entitled to a preliminary injunction preventing Mansfield from interfering with its business practices, including its fuel supply and other relationships with vendors, and its relationship with North Carolina's Department of Environment and Natural Resources (DENR).

The language of § 2805(b)(2)(A)(i) suggests that an operator must demonstrate either an actual termination or non-renewal of a franchise agreement in order to obtain injunctive relief. Nevertheless, the Fourth Circuit has recognized that the PMPA also applies to constructive termination. ***Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 363 n. 5 (4th Cir. 1986) (sometimes, "*Barnes I*").** In *Barnes I*, a franchisee/gas station operator sued the franchisor/oil company after the latter assigned its interest in the franchise to a third party. The franchisee maintained that the assignment, which increased the cost of gasoline as a result of the change in supplier, gave rise to a claim for relief under the PMPA. ***Id.* at 359.** The Circuit agreed, noting that the PMPA functioned "to protect franchisees from overbearing, burdensome conduct by the franchisor during the term of

the franchise." ***Id.*** **at 362-63 ("Therefore, if Barnes can prove her allegations, Gulf has terminated her franchise, and she is entitled to relief.").** When *Barnes I* was appealed after remand, the Fourth Circuit in *Barnes II* summarized its previous ruling:

> In *Barnes I* . . . we ruled that the assignment of a franchise that increases a retailer's gasoline cost over the stipulated franchise price furnishes a cause of action against the refiner under PMPA. We also ruled that if [franchisee] could prove at trial that the assignment violated state law, this too would constitute unjustified termination of the franchise.

***Barnes v. Gulf Oil Corp.*****, 824 F.2d 300, 302 (4th Cir. 1987) (sometimes *"Barnes II"*) (citing *Barnes I*, 795 F.2d at 358-59, 363-64).**

In *Barnes*, the plaintiff did not suffer a complete loss of the benefits of the motor fuel supply contract between her and the defendant franchisor. Rather, she was forced by defendant's actions to raise her sale prices, which resulted in the decline of net sales and income. Thus, a complete loss is not required to establish a claim for constructive termination under the PMPA. ***Barnes I*****, 795 F.2d at 61; *see also Pro Sales, Inc. v. Texaco, U.S.A.*, 792 F.2d 1394, 1399 (9th Cir. 1986) (stating the PMPA "congressional plan would be frustrated by requiring a franchisee to go out of business before invoking the protections of the PMPA");**

***Marcoux v. Shell Oil Prod. Co., LLC*, 524 F.3d 33 (1st Cir. 2008) (recognition of constructive termination under these facts prevents the assignor/franchisor from shielding itself against liability through the use of another corporation).**

Here, Jordan Entities has shown the existence of a serious question about whether they were constructively terminated as a result of Mansfield's alleged breaches of duty including misrepresenting fuel prices to Jordan Entities, failing to set fuel prices properly, breach of fiduciary duties to Jordan Entities (including positioning itself to benefit from the sales of fuel supplied to Jordan Entities' competitors in the Robbinsville SOLO store area), failing to pass benefits such as discounts on to Jordan Entities, miscalculating volume shrinkage, and failing to provide adequate facilities and certain accounting records. Mansfield's conduct would thus constitute constructive termination.

As in *Barnes I and II*, Jordan Entities contends these acts on the part of Mansfield were designed to cause, and did cause, Jordan Entities to lose large amounts of profit and income on sales at its stores, while Mansfield maintained its own position. The Court finds, therefore, that

Jordan Entities has sufficiently alleged constructive termination of the franchise agreement between it and Mansfield to invoke PMPA remedies.

Moreover, Jordan Entities' motion seeking injunctive relief raises serious questions which go to the merits of the issue of "fair ground for litigation." The PMPA offers a relaxed standard for injunctive relief in order to accomplish the remedial goals of the legislation. Whether there are sufficiently serious questions as to the merits differs significantly from the required showing for an injunction under Rule 65. ***Saad v. Shell Oil Company*, 460 F. Supp. 114, 117 (E.D. Mich. 1978).** While the test applied in the ordinary case is whether the complainant has made a strong showing of a likelihood of prevailing on the merits, the PMPA

> is intended to require less than that but it is clear that it does require something. Instead of a "strong showing" or "probability" of success, the terms "serious question" and "fair ground for litigation" suggest merely a reasonable chance of success, something far less than the probability or likelihood required by [the ordinary injunction case].

***Id.*; *see also*, *N.I. Petroleum Ventures Corp., v. GLES, Inc.*, 333 F. Supp. 2d 251, 261 (D. Del. 2004) (held that there were serious disputed issues for litigation pertaining to whether plaintiff maintained adequate supplies of fuel consistent with its obligations under the agreement); *Davy v. Murphy Oil Corp.*, 488 F. Supp. 1013, 1018 (W.D.**

**Mich. 1980) (since notice requirements of PMPA had not been satisfied, it followed that "the standards for granting preliminary injunctions regarding the existence of 'sufficiently serious questions going to the merits to make such questions a fair ground for litigation'" had been satisfied); *Avramidis v. Atlantic Richfield Co.*, 623 F. Supp. 64, 67 (D. Mass. 1985) ("sufficiently serious question" to entitle the gas station operators to relief was held to exist where the operators alleged successor franchisor had not offered them a franchise on nondiscriminatory terms); *Sexe v. Husky Oil* Co., 475 F. Supp. 135, 136-37 (D. Mont. 1979) (sufficiently "serious question" as to whether the oil company's "newly-formulated rental policy was arbitrary and applied in a discriminatory fashion" and a fair ground for litigation).** Thus, in this case, the PMPA will "be given a liberal construction consistent with its goal of protecting franchisees." ***Humboldt Oil co., Inc. v. Exxon Co., U.S.A.*, 695 F.2d 386, 389 (9th Cir. 1982).**

In the case at bar, Jordan Entities has offered evidence in support of injunctive relief that shows Mansfield engaged in many acts that jeopardize the survival of Jordan Entities' business, and seek to enjoin Mansfield from (1) interfering with delivery of fuel and other items; (2) communicating to

suppliers and vendors that they are not to deliver fuel or other supplies to Jordan Entities and insinuating that doing so would cause non-compliance with DENR; (3) suggesting that there are grounds for DENR to take action against these vendors; and (4) refusing to renew permits on the underground storage tanks that Jordan Entities must use to stay in business, or from interfering with Jordan Entities' efforts at obtaining certification for the tanks. The Court finds, therefore, that the record discloses serious questions which go to the merits and offer a fair ground for litigation. The Court not need determine whether there is a strong showing or probability of success on the merits, as the existence of serious questions and a fair ground for litigation are present and establish a reasonable chance for Jordan Entities to succeed on the merits and such meet the standards set forth under the PMPA.

Both in response to Jordan Entities' motion for preliminary injunction, and in its own claim and delivery motion, Mansfield has raised issues around title to the underground storage tanks and other equipment. As set forth below, Jordan Entities argues, and the Court agrees, that any issues involving losses Mansfield may sustain arising out of Jordan Entities' retention or use of equipment in which it claims an ownership interest are

readily addressed by claims for damages to be decided at the close of these cases. In fact, the hardship to Jordan Entities is such that a denial of this preliminary injunction will likely result in driving it out of business and causing financial demise, as Andy Jordan and Deborah Dupuis have also executed personal guarantees for loans in connection with Andrews SOLO and Robbinsville SOLO. If Mansfield is allowed to continue with the acts sought to be enjoined, Jordan Entities will have continued difficulty or inability to receive fuel and other inventory at either of its stores. Jordan Entities' business relationships with customers, vendors, suppliers, and others with whom it has contracts will also deteriorate, based upon Jordan Entities' inability to keep their contracts with them if Mansfield's alleged disparaging comments about Jordan Entities to suppliers and others result in their refusal to do business with Jordan Entities.

In contrast, the hardship to Mansfield, should injunctive relief be granted to Jordan Entities, is slight. It will be receiving monthly rental for use of its tank and property which could be adjusted by motion in the cause if found by the Court to be either inadequate or excessive. Mansfield would be enjoined from interfering with Jordan Entities' business relationships. Mansfield has already entered into supply agreements and

relationships with some of Jordan Entities' competitors in the same area or nearby locations. Since the business relationship between Mansfield and Jordan Entities has already been terminated, Mansfield does not risk losing business or revenue by entry of injunctive relief in favor of Jordan Entities. Nor does Mansfield have any legitimate or lawful business reason to continue to engage in the conduct complained of in Jordan Entities' motion for injunctive relief. While Mansfield has expressed concern about its potential liability for leaks in the underground storage tanks, the acquisition of insurance against this risk and the parties' shared potential liability for claims over and against each other in the event that an escape occurs, such provides adequate protection to Mansfield.

Denial of injunctive relief to Jordan Entities under the facts of this case will result in "inducement to [Mansfield] to delay and prolong the litigation, continuing, meanwhile, the assault upon the good will of the complainants, so that, even if final decree be at last rendered in favor of complainants, the good will will have been so seriously and irreparably injured, if not in great measure destroyed, as to leave the complainants practically without remedy." ***Garrett v. T.H. Garrett & Co.,*** **78 F. 472, 479 (6th Cir. 1896).** This undesired and unjust result is what prompted

Congress to enact the PMPA. **S.Rep. No. 731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S. Code Cong. & Ad. News 876 [cited as Senate Report].**

Public policy also favors injunctive relief by preserving a business which, if abandoned, may result in bankruptcy for Jordan Entities. ***Wojciechowski v. Amoco Oil Co.*, 483 F. Supp. 109, 112 (D. Wis. 1980).** The same concern appears in Andy Jordan's affidavit.

> If Mansfield is allowed to continue to interfere with our fuel suppliers and trucking companies, or to seize equipment we use in the operation of the convenience stores, it will succeed in driving us out of business immediately and the owners will certainly face bankruptcy since personal guarantees have been issued on first mortgages on both properties. As shown in our Amended Complaint, and in this affidavit, Mansfield is trying to injure us after having constructively terminated our business relationship by creating competition against us, defrauding us on our financial dealings and, consequently, by damaging our inside sales in promoting the interest of our competitors over our interests despite the existence of a fiduciary duty to us as partners. If Mansfield is allowed to continue this behavior during the course of litigation, it will have achieved its goal of driving us out of business and will seek to replace us with a party who is unaware of how it does business.

**Affidavit of Andy P. Jordan, *attached to* Jordan Entities' Motion for Preliminary Injunction, filed June 19, 2009, in Civil No. 2:09CV33, ¶ 14.** The Court finds that the public interest will be served by enjoining Mansfield's acts in an effort to preserve Jordan Entities' business which, if

abandoned, may result in bankruptcy. ***Wojciechowski,* 483 F. Supp. at 112.** The public interest is further served if Jordan Entities is able to continue to meet its financial obligations to third parties arising out of its ownership and operation of the Robbinsville store and the Andrews store. Finally, if Jordan Entities is driven out of business, then the public can be injured by not having competitive fuel pricing at the locations where Jordan Entities now serves customers. Its current competitors would then be given a monopolistic advantage, rendering them able to charge prices more of their choosing and less subject to market constraints, resulting in injury to the public as a whole.

Having determined that Jordan Entities is to injunctive relief, the Court now turns it attention to Mansfield's motion for claim and delivery. The Court finds the claim and delivery motion will be denied at this stage of the litigation. The destructive practical effects of such an order prior to a determination of the issues herein mitigate against granting this relief. Such an order would be detrimental to Jordan Entities and result in little or no immediate benefit to Mansfield.

The PMPA is closely tailored to fit the facts of this case and invocation of the claim and delivery statute would run contrary to the

congressional purposes in enacting the PMPA to assist franchisees. The PMPA is specifically designed to protect parties in the position of Jordan Entities. It is the PMPA, not the claim and delivery statute, which provides the proper vehicle for preliminary relief, and that relief flows to Jordan Entities.

In this case, it is clear that any preliminary relief, however styled, is improper if it provides for removal from Jordan Entities' property of the underground storage tanks and accompanying equipment currently in use. Mansfield has not shown that the underground storage tanks are unique or that any injury it sustains by Jordan Entities' retention of them cannot be remedied by money damages. On the other hand, damage to Jordan Entities is irreparable if the underground storage tanks and accompanying equipment are removed, resulting in a disruption of operations, loss of customers, goodwill, cash flow necessary to sustain debt service, and other benefits. Preliminary relief for Mansfield is, therefore, not appropriate at this time, inasmuch as the payment of money damages (if proved) is a suitable remedy.

## III. ORDER

**IT IS, THEREFORE, ORDERED** that WNC Stores, LLC, WNC SOLO, Inc., formerly known as Market Center, Inc., and White's SOLO, LLC, have established that they are entitled to equitable relief under the Petroleum Marketing Practices Act and as so, their motion for preliminary injunction is **ALLOWED.**

**IT IS FURTHER ORDERED** that the motion by Mansfield Oil Company of Gainesville, Inc., for claim and delivery is hereby **DENIED.**

A Preliminary Injunction is filed herewith.

Signed: August 18, 2009

Lacy H. Thornburg
United States District Judge